[No. A097568. First Dist., Div. Two. July 11, 2003.]

In re RETIREMENT CASES.

[Eight coordinated cases.*]

*Francis v. Board of Retirement of the Stanislaus County Employees' Retirement Association (A097568; Stanislaus County Super. Ct. No. 172034); Los Angeles County Professional Peace Officers' Association v. Board of Retirement of the Los Angeles County Employees' Retirement Association (A097692; L.A. County Super. Ct. Nos. BS 051355, BS 051774); Teamsters Union Local 856, AFL-CIO v. Board of Retirement of the San Mateo County Employees' Retirement Association (A097701; San Mateo County Super. Ct. No. 404187); Price v. Board of Retirement of the Sacramento County Employees' Retirement System (A097705; Sacramento County Super. Ct. No. 97 CS 03043); Buda v. Sacramento County Employees' Retirement System (A097744; Sacramento County Super. Ct. No. 98 CS 00703); Sacramento County Deputy Sheriff's Association v. Board of Retirement of the Sacramento County Employees' Retirement System (A097924; Sacramento County Super. Ct. No. 98 CS 00443); Service Employees International Union, Local 535, AFL-CIO v. Tulare County Employees' Retirement Board (A098686; Tulare County Super. Ct. No. 98-183750).

Silver, Hadden & Silver and Stephen H. Silver for Plaintiffs and Appellants (plan members).

Davis, Cowell & Bowe, Philip Paul Bowe and W. David Holsberry for Plaintiff and Appellant Los Angeles County Professional Peace Officers' Association et al (LACERA members).

Steefel, Levitt & Weiss, Harvey L. Leiderman and Ashley K. Dunning for Board of Retirement of the Orange County Employees' Retirement System as Amicus Curiae on behalf of Plaintiffs and Appellants (plan members).

Thomas F. Casey III, County Counsel (San Mateo) and Brenda B. Carlson, Deputy County Counsel, for Defendants and Appellants (retirement boards).

Morrison & Foerster and Michael V. Toumanoff for Defendant and Respondent Board of Retirement of the Los Angeles County Employees' Retirement System (LACERA Board).

Jones, Day, Reavis & Pogue, Elwood Lui, Scott D. Bertzyk and Eugenia Castruccio Salamon for Real Parties in Interest and Appellants (Counties).

Jones, Day, Reavis & Pogue, Elwood Lui, Scott D. Bertzyk, Eugenia Castruccio Salamon; Lloyd W. Pellman, County Counsel (Los Angeles), Raymond G. Fortner and Roger M. Whitby, Deputy County Cousel, for Real Party in Interest and Appellant County of Los Angeles.

---

**OPINION**

**LAMBDEN, J.**—The counties involved in these consolidated appeals maintain employee retirement plans under the County Employees Retirement Law of 1937 (CERL) as codified in 1947. (Gov. Code, § 31450 et seq.)[1] The retirement boards in these counties are required to determine whether items of remuneration paid to employees qualify as "compensation" under section 31460 and "compensation earnable" pursuant to section 31461, and therefore must be included as part of a retiring employee's "final compensation" (§ 31462 or § 31462.1) for purposes of calculating the amount of a pension.

Prior to 1997, many, if not all, of the 20 retirement boards operating under CERL calculated employees' pension benefits according to the holding in *Guelfi v. Marin County Employees' Retirement Assn.* (1983) 145 Cal.App.3d

---

[1] All further unspecified code sections refer to the Government Code.

297 [193 Cal.Rptr. 343] (*Guelfi*). The *Guelfi* court held that an item of "compensation" under CERL must be received by all employees in the applicable grade or class of position for it to be a mandatory part of a retiring employee's "compensation earnable" and "final compensation" on which an employee's pension is based. (*Id.* at pp. 303–307.) ▮ Fourteen years later, our Supreme Court, in *Ventura County Deputy Sheriffs' Assn. v. Board of Retirement* (1997) 16 Cal.4th 483 [66 Cal.Rptr.2d 304, 940 P.2d 891] (*Ventura*), overruled *Guelfi's* interpretation of "compensation earnable," holding that "items of 'compensation' paid in cash, even if not earned by all employees in the same grade or class, must be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Ventura, supra,* at p. 487.)

The *Ventura* court declined to consider whether its decision should have retroactive application, which now is one of the questions before us. After numerous counties and retirement boards refused to apply the *Ventura* holding retroactively, Randall E. Francis, a retired county employee, filed a petition for writ of mandamus (Code Civ. Proc., § 1085) on behalf of himself and other members of his class against the Board of Retirement of the Stanislaus County Employees' Retirement Association, with the County of Stanislaus as real party in interest, alleging that *Ventura* must be applied retroactively; that arrears contributions or interest collected cannot, among other things, be from members not benefiting from retroactive relief; and that cash-outs of unused leave upon separation from service, employer's payments for insurance premiums, and employer's payments to the retirement fund must be included in the calculations of "final compensation" for retirement benefits under CERL. Numerous similar petitions were filed across the state; the cases were coordinated pursuant to Code of Civil Procedure section 404 et seq. and California Rules of Court, rule 1500 et seq.

The trial court ruled that the *Ventura* decision should be applied retroactively; that the retirement boards did have discretion to collect arrears and that their discretion included the ability to collect arrears beyond the three-year statute of limitations period (Code Civ. Proc., § 338, subd. (d)); and that CERL did not mandate that various items of remuneration that did not involve cash payments to employees had to be included in the calculations of "final compensation" for retirement benefits. Three counties[2] (collectively, counties) appeal from those portions of the judgments applying *Ventura* retroactively and giving the retirement boards discretion to collect arrears.

---

[2] Counties appealing are Los Angeles, San Mateo, and Sacramento. Those counties appearing only in response to the appeals filed by their respective plan members are Stanislaus and Tulare.

Two boards of retirement[3] (collectively, retirement boards) appeal from those portions of the judgments regarding retroactivity. Numerous individual plan members suing on behalf of themselves and others and associations[4] (collectively, plan members) appeal from those portions of the judgments regarding collections of arrears and the exclusion of items of remuneration from the calculation of retirement benefits under CERL. We conclude that the trial court's rulings were correct, and affirm.

## BACKGROUND

Counties maintain employee retirement plans under CERL. (§ 31450 et seq.) CERL requires retirement boards to determine whether the remuneration paid in cash qualifies as "compensation" under section 31460 and "compensation earnable" pursuant to section 31461, and therefore must be included as part of a retiring employee's "final compensation" (§ 31462 or 31462.1) for purposes of calculating the amount of a pension.

Prior to 1997, many, if not all, of the 20 retirement boards interpreted "compensation earnable" under CERL in accordance with the holding in *Guelfi, supra,* 145 Cal.App.3d 297. The *Guelfi* court held that payments received for overtime, uniform allowance, and educational incentive pay did not satisfy the requirements for "compensation earnable." (*Id.* at p. 307.) It determined that an item of "compensation" must be received by all employees in the applicable grade or class of position for it to be a mandatory part of a retiring employee's "compensation earnable" and "final compensation" on which an employee's pension is based. (*Id.* at pp. 303–307.)

Fourteen years after the Court of Appeal had decided *Guelfi,* the California Supreme Court, in *Ventura, supra,* 16 Cal.4th 483, considered the meaning of "compensation" and "compensation earnable" under CERL. It overruled

---

[3] Retirement boards appealing are Board of Retirement of the San Mateo County Employees' Retirement Association and Board of Retirement of the Sacramento County Employees' Retirement System. Those retirement boards appearing only in response to the appeals filed by their respective county and/or plan members are Board of Retirement of the Stanislaus County Employees' Retirement Association, Board of Retirement of the Los Angeles County Employees' Retirement System (LACERA Board), and Tulare County Employees' Retirement Board.

[4] Plan members appealing are: Randall E. Francis; Los Angeles County Professional Peace Officers' Association; Los Angeles County Fire Fighters, Local 1014; California Association of Professional Employees; Arthur J. Reddy; William Sieber; Dallas Jones; Lee Stark; James E. Vogts; Milton Cohen; Teamsters Union Local 856, AFL-CIO; William Britschgi; Robert Cassetta; Joseph Martinelli; Nancy Green; Richard Price; Scott Eckert; Ernest Buda; Thomas J. Burns; Michael Dutra; Sacramento County Deputy Sheriff's Association; Robert White; Edward Shaughnessy; Service Employees International Union, Local 535, AFL-CIO; Tulare County Corrections Association, affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; Tulare County Deputy Sheriff's Association; and Donald Fielding.

*Guelfi*'s interpretation of "compensation earnable" by holding that "items of 'compensation' paid in cash, even if not earned by all employees in the same grade or class, must be included in the 'compensation earnable' and 'final compensation' on which an employee's pension is based." (*Ventura, supra,* at p. 487.)

Retirement boards began to include a variety of cash payments in their computations for "compensation earnable" that they had not included earlier, but they restricted these modified calculations to "compensation" earned on or after October 1, 1997, the date the Supreme Court declined to rehear *Ventura, supra,* 16 Cal.4th 483. (*Ventura* was filed on August 14, 1997.) They did not modify their calculations to include a variety of cash payments in "compensation earnable" if plan members had earned the "compensation" prior to October 1, 1997.

Plan members throughout the state who did not have their "compensation earnable" modified to comply with *Ventura,* because their "final compensation" was based on compensation earned prior to October 1, 1997, filed writs of mandate. They contended that certain cash premiums should not have been excluded from their "final compensation" and that the holding of *Ventura* should apply retroactively. The actions by plan members were coordinated under Code of Civil Procedure section 404 et seq.[5] on December 21, 1998. The court recommended that the coordinated proceedings be assigned to the San Francisco County Superior Court because the City and County of San Francisco did not operate under CERL. It also ordered "that the reviewing court having appellate jurisdiction [of the coordinated actions] is the Court of Appeal for the First Appellate District."

On January 19, 1999, the Honorable Stuart R. Pollak, sitting in San Francisco, was assigned as coordination trial judge. Liaison counsel were designated to represent counties, retirement boards, and plan members. Most of the coordinated cases also were converted to class actions.

At the coordinated trial,[6] the court first considered whether CERL mandates inclusion of certain employment benefits in the calculation of retirement benefits. Plan members requested that the following items be included:

---

[5] Code of Civil Procedure section 404 provides in pertinent part: "When civil actions sharing a common question of fact or law are pending in different courts, a petition for coordination may be submitted ...."

[6] At different points in time, before and during the coordinated proceedings, various counties and retirement boards settled with their plan members and/or voluntarily resolved to implement *Ventura* retroactively. Although the Board of Retirement of the Orange County Employees' Retirement System voluntarily resolved (in February 1998) to apply *Ventura* retroactively, it appeared and played a unique role in the coordinated trial.

cash-outs by employees of unused leave upon separation from service, insurance-related payments made by the employer, and employer payments of mandatory employee retirement contributions that are paid by the employer directly to the retirement plan. The court concluded that none of these was required to be included in the formula for calculating pension benefits.

The superior court next considered the question of retroactivity, determining that the general rule of applying judicial decisions retroactively (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978–979 [258 Cal.Rptr. 592, 772 P.2d 1059] (*Newman*)) should govern here. The superior court explained: "A decision that is disapproved or overruled is considered to have misstated the law, and consequently never was the law. (*Id.* at [p.] 979.) This general rule applies equally to pension cases. Where retirement allowances are calculated improperly based on a good faith misapplication of the law, retroactive recalculations must be made for retirees whose claims are filed within the three-year statute of limitations. (*County of Marin [Assn. of] Firefighters v. Marin County Employees Retirement Assn.* (1994) 30 Cal.App.4th 1638 [36 Cal.Rptr.2d 736] [*(Marin Firefighters)*]); *Dunham v. City of Berkeley* (1970) 7 Cal.App.3d 508 [86 Cal.Rptr. 569]; *Terry v. City of Berkeley* (1953) 41 Cal.2d 698 [263 P.2d 833] [*(Terry)*]; *Abbott v. City of Los Angeles* (1960) 178 Cal.App.2d 204 [3 Cal.Rptr. 127] (*Abbott II*).) There is no reason why the same rule should not be applied here, where pensions were miscalculated based on a prior erroneous judicial construction of the law." In the footnote, the trial court noted that the law may be different in federal cases.

The trial court also determined that considerations of fairness and public policy did not justify denial of the retroactive application of *Ventura*. The court stated that retirement boards may have established reasonable reliance on the former interpretation of the statute, but they did not establish "a hardship emanating from such reliance sufficient to invoke a fairness exception." The court also concluded that the retroactive application of *Ventura* did not unconstitutionally impair contractual obligations. It explained that the retroactive application of *Ventura* did not reduce or eliminate any contractual rights of retired plan members and "[retirement boards] have not identified any contractual rights of their own that will be adversely affected by retroactive application of that decision." Finally, the court ruled that retirement boards have the discretion to collect arrears; full arrears contributions are authorized, but not mandatory.

The trial court entered final judgments, denying those portions of plan members' petitions for writs of mandate requesting to have additional items of remuneration calculated as part of CERL pension benefits. It issued peremptory writs of mandate commanding retirement boards "to recalculate

the final compensation of members whose final compensation measurement period occurred in whole or in part prior to the effective date upon which it implemented the *Ventura* decision in the same manner [they are] calculating 'compensation earnable' and 'final compensation' after that date ...."

Following Judge Pollak's decision, several other retirement systems settled. Three counties are challenging (see fn. 2, *ante*) those portions of the judgments that applied *Ventura* retroactively and that gave retirement boards discretion to collect arrears. Two retirement boards are challenging (see fn. 3, *ante*) those portions of the orders applying *Ventura* retroactively. Numerous plan members appeal (see fn. 4, *ante*) from those portions of the judgments regarding the collection of arrears and the denial of their requests to have certain items included in the calculation of their pensions.

The appeals were consolidated before us for resolution. On March 14, 2002, we granted the parties' stipulated motion to maintain liaison counsel and for a coordinated briefing schedule.[7] In addition to receiving briefs from liaison counsel for counties, retirement boards, and plan members, we received briefs from the County of Los Angeles (L.A. County) and the plan members of the Los Angeles County Employees' Retirement Association (LACERA members) and an amicus curiae brief from the Board of Retirement of the Orange County Employees' Retirement System (OCERS).[8]

## DISCUSSION

In this opinion, we address three questions regarding the implementation of the *Ventura* decision: (1) Should we limit the application of the *Ventura* holding to calculations of "compensation" after October 1, 1997, the effective date of the decision? (2) If we hold that *Ventura* applies retroactively, do the retirement boards have discretion to collect arrears and is that discretion limited? (3) Should items of remuneration that do not involve cash payments to the employee prior to his or her retirement be included in the pension calculation? Prior to our examination of each of these issues, we set forth the relevant law.

### I. RELEVANT LAW

■ The counties involved in these consolidated appeals maintain employee retirement plans under CERL, which mandates that the funds for the

---

[7] We consolidated the San Bernardino appeals, case Nos. A100686 and A100721 (San Bernardino County Super Court Nos. SCV 47008, SCV 55755) with this consolidated action on April 23, 2003. But on June 10, 2003, at the parties' request, we severed the San Bernardino appeals from this consolidated action and remanded the cases to the trial court for further proceedings in contemplation of settlement.

[8] In a separate opinion, we will address the issues raised by the appeals from the trial court's awards of attorney fees.

pensions contain both employer and employee contributions and that the level of funding be based on actuarial valuations. (§ 31450 et seq.) Under CERL, an employee's pension "is a combination of a retirement annuity based on the employee's accumulated contributions supplemented by a pension established with county contributions sufficient to equal a specified fraction of the employee's 'final compensation.' (See, e.g., §§ 31664, 31676.1.)" (*Ventura, supra,* 16 Cal.4th at p. 490.) The proper administration of a CERL pension system includes a determination of what payments in addition to base pay must be included when determining an employee's "final compensation." (*Ibid.*)

When determining what payments are to be included, we use the definitions provided in CERL and resolve any ambiguity or uncertainty in favor of the pensioner, mindful that such construction must be consistent with the clear language and purpose of the statute. (*Ventura, supra,* 16 Cal.4th at p. 490.)

Section 31460 defines "compensation" as "the remuneration paid in cash out of county or district funds, plus any amount deducted from a member's wages for participation in a deferred compensation plan ..., but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member."

Under section 31461, "compensation earnable" by a member of the plan "means the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay. The computation for any absence shall be based on the compensation of the position held by [the member] at the beginning of the absence. Compensation, as defined in Section 31460, that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid."

Section 31462.1 defines "final compensation" as "the average annual compensation earnable by a member during any year elected by a member at or before the time he files an application for retirement, or, if he fails to elect, during the year immediately preceding his retirement." Section 31462 is substantially the same as section 31462.1, and differs only in that it sets the relevant time period as "during any three years elected by a member."

These definitions were first construed and applied by the Court of Appeal in *Guelfi, supra,* 145 Cal.App.3d 297. In *Guelfi,* two retired peace officers claimed that their final compensation should have been calculated to include their overtime, educational incentive pay, and uniform allowance. (*Id.* at

pp. 299–300.) The *Guelfi* court concluded that educational incentive pay and overtime fit the definition of "compensation," but these items were not a mandatory part of a retiring employee's "compensation earnable," and therefore not part of the "final compensation" on which a pension is calculated, because not all employees in the same grade or class of position qualified for this pay. (*Id.* at pp. 303–307.)

Subsequently, the Supreme Court, in *Ventura, supra,* 16 Cal.4th 483, considered these same definitions in CERL when a county deputy sheriffs' association and three retirees challenged the county retirement board's determination of "final compensation." This determination excluded the county's contributions to an employee's deferred compensation plan, overtime pay, cash payments of bilingual premium pay, a uniform maintenance allowance, educational incentive pay, additional compensation for scheduled meal periods for designated employees, pay in lieu of annual leave accrual, holiday pay, a motorcycle bonus, a longevity incentive, and a field training officer bonus. (*Id.* at pp. 488–489.) The court pointed out that sections 31460 and 31461 were ambiguous. (*Id.* at p. 493.) The court stated that the method of construction is first to determine what falls into the broad definition of "compensation" under section 31460, and then determine whether it falls within the narrower category of "compensation earnable" as defined in section 31461 "and thus form[s] the basis for the calculation of 'final compensation' on which the pension is based pursuant to section 31462 or 31462.1." (*Ventura, supra,* at pp. 493–494.)

The *Ventura* court explained that, under section 31460, "compensation" is remuneration not excluded by that section. (*Ventura, supra,* 16 Cal.4th at p. 494.) The court concluded that the Legislature did not consider county contributions to an employee's deferred compensation plan as "compensation" as defined in section 31460. (*Ventura,* at p. 495.) In addition, section 31460 excludes the monetary value of an advantage provided in kind. However, the *Ventura* court held, when the advantages are paid in cash, and not in kind, they are not excluded. (*Id.* at p. 497.) The court therefore agreed with the *Guelfi* court that a longevity bonus and cashed-out accrued vacation were remuneration under section 31460. (*Ventura, supra,* at p. 497.) Further, bilingual premium pay, pay for acting as a field training officer and for motorcycle duty, and educational incentive pay also qualify as "compensation." (*Id.* at pp. 497–499.) This analysis of "compensation" did not differ significantly from the one employed by the Court of Appeal in *Guelfi.*

The *Ventura* court, however, concluded that the Court of Appeal in *Guelfi* erred in its construction of the statute' term "compensation earnable." It pointed out that the holding in *Guelfi* was not prior precedent of the Supreme Court; the issue was therefore one of first impression for it. (*Ventura, supra,*

16 Cal.4th at pp. 505–506.) The court examined the predecessor statutes to sections 31460 and 31461 and the use of the terms "compensation" and "compensation earnable" in the Public Employees' Retirement Law (PERL) (§ 20000 et seq.). (*Ventura*, at pp. 495–497, 501–505.) The court concluded that, in the context of CERL and PERL, " 'compensation earnable' is the average pay of the individual retiring employee computed on the basis of the number of hours worked by other employees in the same class and pay rate—that is the average monthly pay, excluding overtime, received by the retiring employee for the average number of days worked in a month by the other employees in the same job classification at the same base pay level." (*Ventura*, at p. 504.) The *Ventura* court concluded that, with the exception of overtime, all of the premiums that it had determined were remuneration must be included as "compensation earnable" and therefore included in the calculation of the employee's pension. (*Id.* at pp. 504–505.)

The Supreme Court in *Ventura* refused to decide whether its decision applied retroactively to any other county. (*Ventura, supra,* 16 Cal.4th at p. 507.) As to the county before it, the court concluded: "There may be unanticipated costs to Ventura County if the pensions of the individual plaintiffs and the employees the association represents must be recalculated and adjusted upward. If so, to comply with the financial provisions of CERL (§ 31580 et seq.) and accommodate future increases, the county may have to make a supplemental appropriation and adjust the future annual appropriation for its contribution to the pension fund to cover the increase in future retiree pensions that results from inclusion of additional items of 'compensation' in 'compensation earnable.' Past experience should enable the county to anticipate the number of employees who will receive premium pay, however, and adjustments of this nature are contemplated by CERL. (See §§ 31453, 31454.) Nothing in this record suggests that the burden on the county fisc justifies either perpetuation of an erroneous construction of the applicable statutes or denying these plaintiffs the benefit of our decision." (*Ventura, supra,* at p. 507.)

## II. Retroactivity

A. *The General Rule of Retroactivity and Standard of Review*

Retirement boards and counties contend that they had diligently calculated pension benefits under CERL as set forth by the Court of Appeal in *Guelfi, supra,* 145 Cal.App.3d 297. Once the Supreme Court articulated its interpretation of CERL, they attempted to implement the holding in *Ventura, supra,* 16 Cal.4th 483 for all current employees and for all retirees whose final compensation periods began on or after October 1, 1997 (the date the Supreme Court denied rehearing on *Ventura*). Plan members, however,

contend that *Ventura*'s holding should also be applied to those retirees whose final compensation periods fell in whole or in part prior to October 1, 1997. They contend that they are entitled to corrected calculations of their pension benefits, if not barred by the statute of limitations. (See *Marin Firefighters, supra*, 30 Cal.App.4th 1638; *Dunham v. City of Berkeley, supra*, 7 Cal.App.3d 508; *Terry, supra*, 41 Cal.2d 698; *Abbott II, supra*, 178 Cal.App.2d 204.)

Retirement boards claim that "the language of the [*Ventura*] decision shows that the [Supreme] Court both expected and intended that the effects of the decision would be almost entirely prospective even in Ventura County—the one county that was a party in the case." However, contrary to retirement boards' assertions, the Supreme Court expressly declined to address the issue of retroactivity when it stated: "No other county is before us in this matter, however, and we need not decide whether this decision applies retroactively to any other county." (*Ventura, supra*, 16 Cal.4th at p. 507.) Accordingly, we need to consider the application of the rule of retroactivity and judicial decisions to the facts of this case.

It is well settled that the general rule in California is that "a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law." (*County of Los Angeles v. Faus* (1957) 48 Cal.2d 672, 680–681 [312 P.2d 680] (*Faus*), abrogated on another issue by Evid. Code, § 822.) Counties attempt to circumscribe this rule to criminal and tort cases, but this general rule of retroactivity has been applied *without regard* to the area of law at issue (see *Newman, supra*, 48 Cal.3d at p. 995, fn. 3 (dis. opn. of Broussard, J.)). " ' "Indeed, a legal system based on precedent has a built-in presumption of retroactivity." [Citation.]' " (*McManigal v. City of Seal Beach* (1985) 166 Cal.App.3d 975, 981 [212 Cal.Rptr. 733] (*McManigal*).)

Our Supreme Court has "recognized exceptions to [the general rule of retroactivity] when considerations of fairness and public policy preclude full retroactivity. [Citation.] For example, where a constitutional provision or statute has received a given construction by a court of last resort, and contracts have been made or property rights acquired in accordance with the prior decision, neither will the contracts be invalidated nor will vested rights be impaired by applying the new rule retroactively." (*Peterson v. Superior Court* (1982) 31 Cal.3d 147, 151–152 [181 Cal.Rptr. 784, 642 P.2d 1305] (*Peterson*), citing *Faus, supra*, 48 Cal.2d at p. 681; see also *Moradi-Shalal v. Fireman's Fund Insurance Companies* (1988) 46 Cal.3d 287, 305 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*).) Fairness and public policy may also require an exception when "retroactive application of a decision

would raise substantial concerns about the effects of the new rule on the general administration of justice, or would unfairly undermine the reasonable reliance of parties on the previously existing state of the law. In other words, courts have looked to the 'hardships' imposed on parties by full retroactivity, permitting an exception only when the circumstances of a case draw it apart from the usual run of cases." (*Newman, supra,* 48 Cal.3d at p. 983.)

Counties, citing *Dillon v. Board of Pension Commrs.* (1941) 18 Cal.2d 427, 430 [116 P.2d 37], claim that the trial court erroneously shifted the burden of proof regarding the retroactive application of *Ventura* to them. The *Dillon* court states that, when the board denies the plaintiff's right to a pension, the plaintiff may bring a mandamus action to establish as a matter of law that he or she is entitled to the status of a pensioner. (*Dillon, supra,* at p. 430.) That is clearly not the issue here. No one denies that plan members are entitled to a pension. Rather, the question is whether the decision in *Ventura* has retroactive effect. Since counties and retirement boards are arguing that an *exception* to the general rule of retroactivity applies to them, they have the burden of proof. (See, e.g., *Estate of Propst* (1990) 50 Cal.3d 448, 465 [268 Cal.Rptr. 114, 788 P.2d 628] (*Propst*) [prior to deciding whether judicial decision should be applied retroactively to each person, "the cause must be remanded to afford respondent an opportunity to present …proof" of hardship or detrimental reliance].)

We review the trial court's ruling that neither fairness nor public policy warranted an exception to the retroactivity rule under the abuse of discretion standard. A trial court, "acting as a court of equity, has discretion to fix a more realistic starting date for the payment of retroactive benefits to class members." (*Green v. Obledo* (1981) 29 Cal.3d 126, 142 [172 Cal.Rptr. 206, 624 P.2d 256].) To the extent that counties and retirement boards contend the court erred in its application of the law, we apply the de novo standard of review (see, e.g., *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]). Those findings of fact that support the trial court's ruling, we review for substantial evidence. (*Scott v. Common Council* (1996) 44 Cal.App.4th 684, 689 [52 Cal.Rptr.2d 161].)

Preliminarily, we must first consider what is meant by a retroactive application. Counties and retirement boards contend that a prospective application of *Ventura* would permit them not to modify either the future retirement benefits or the back payments to all plan members who had all or part of their "final compensation" calculated prior to October 1, 1997. OCERS, in its amicus curiae, brief, maintains that, even if *Ventura* is limited to a prospective application, retirement boards must recalculate the future retirement benefits for plan members who had all or part of their "final compensation" calculated prior to October 1, 1997. OCERS asserts that under California law a governmental entity has a mandatory duty to make certain

payments; those payments are deemed "due to the recipient as of the date he first became entitled to them." (*Green v. Obledo, supra,* 29 Cal.3d at p. 141, 172 Cal.Rptr. 206, 624 P.2d 256.)[9] When the Supreme Court in *Green v. Obledo* addressed the issue of retroactivity and the payment of welfare benefits, it only considered the back payments that would be paid to welfare recipients as subject to any exception to retroactivity, not the benefit payments to be made in the future. (*Id.* at pp. 141–143.) Further, it explained that when a governmental entity unlawfully withholds pension benefits from its retirees, "each such payment becomes a debt due to the employee as of the date he was entitled to receive it. It is settled that in such cases each deficient payment constitutes a separate violation triggering the running of a new period of limitations." (*Id.* at p. 141.) OCERS therefore argues that requiring counties and retirement boards to cease "perpetuation of an erroneous construction of the applicable statutes" (*Ventura, supra,* 16 Cal.4th at p. 507) is a prospective application of the decision.[10]

We are not aware of any California case that has addressed the specific issue of retroactivity and pensions. In the federal context, however, courts have considered the question of pensions and retroactivity when invalidating pension systems based on gender-segregated mortality tables as in violation of title VII of the Civil Rights Act of 1964 (Title VII) (42 U.S.C. § 2000e–2(a)(1)). (See, e.g., *Los Angeles Dept. of Water & Power v. Manhart* (1978) 435 U.S. 702 [55 L.Ed.2d 657, 98 S.Ct. 1370] (*Manhart*); *Florida v. Long* (1988) 487 U.S. 223, 237 [101 L.Ed.2d 206, 108 S.Ct. 2354] (*Long*);

---

[9] Counties maintain that *Green v. Obledo, supra,* 29 Cal.3d 126, is distinguishable because the *Green* court was concerned with the retroactive application of a vested right that was unlawfully denied. Here, they argue, plan members have no vested right to a change in the law. We discuss the issue of an alleged change in the law and vested rights in part II.C.

[10] This difference is more than academic. If retroactive application only pertains to the computation of past benefits (and future benefits must be imposed under a prospective application), retroactivity, here, would have minimal fiscal impact. ■ Code of Civil Procedure section 338, subdivision (a), provides a three-year statute of limitations on actions for liability created by statute and therefore benefits would only have to be recalculated for the three years preceding the filing of their lawsuit for those retirees who earned cash premiums. Thus, any argument that an exception to the retroactivity rule should apply on the grounds of fairness and detrimental reliance (see pt. II.D.) would be significantly weakened.

■ Further, although not addressed by any party, we are not compelled to choose simply between a retroactive or prospective application of the *Ventura* decision, but have the discretion to give the decision *limited* retroactive application. (See, e.g., *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226] [considerations of administration of justice required limited retroactive application of its holding]; see also *Green v. Obledo, supra,* 29 Cal.3d at p. 142.) Since we are concluding that none of the exceptions to the retroactivity rule apply here, we need not consider the option of limited retroactivity. Because of our holding, we also do not need to consider the equal protection issues involved with calculating the benefits for those who retired prior to October 1, 1997, on the basis of an incorrect construction of CERL, while awarding benefits to those who retire after October 1, 1997, on the basis of a correct interpretation of CERL.

*Arizona Governing Committee v. Norris* (1983) 463 U.S. 1073, 1092 [77 L.Ed.2d 1236, 103 S.Ct. 3492] (*Norris*); *Retired Public Employees' Ass'n. v. State of Cal.* (9th Cir. 1986) 799 F.2d 511, 515; *Probe v. State Teachers' Retirement System* (9th Cir. 1986) 780 F.2d 776 (*Probe*).) These federal courts have defined retroactivity in the manner advocated by counties and retirement boards (but see our discussion of the relevance of federal cases in pt. II.E.). They have concluded that, because these future annuity payments were funded by past contributions, any court judgment affecting these payments "is fundamentally retroactive in nature." (*Probe, supra,* 780 F.2d at p. 782.)

Since we are holding that the *Ventura* decision should be applied retroactively, we need not settle the question whether future benefits to people who retired before October 1, 1997, is a retroactive or prospective application of *Ventura.* In arriving at our holding, we review the following arguments by retirement boards and counties. Retroactive application is inappropriate because: (1) judicial decisions can have no retroactive effect when none of the parties was involved in the *Ventura* decision or had a lawsuit pending at the time; (2) it would unfairly and unconstitutionally impair vested contract rights; (3) it would be unfair as the parties detrimentally relied on the holding in *Guelfi* and it would not promote public policy concerns; and (4) it would contravene federal case law.

## B. *Considerations of Retroactive Effect and Nonparties to Ventura*

Retirement boards contend that the trial court erred in its retroactive application of the holding in *Ventura* to plan members, counties and retirement boards in this coordinated action because none of them was a party to the lawsuit or had similar lawsuits pending when *Ventura* became final. Moreover, *Ventura* was not a class action. They assert that the Supreme Court mandated retroactive application of its decision only to the parties before it.

In support of their argument, retirement boards cite *Bartman v. Estate of Bartman* (1978) 83 Cal.App.3d 780 [148 Cal.Rptr. 207], and *Newman, supra,* 48 Cal.3d 973. They claim that judicial retroactivity " 'governs events occurring prior to the date of decision, *when such events are at issue in timely filed actions.*' [Citation.]" (*Bartman, supra,* 83 Cal.App.3d at pp. 785–786.) By quoting this language in *Bartman*, they imply that the *Bartman* court held that judicial decisions *only* have retroactive effect on those parties who have a pending lawsuit on the same issue. However, a complete reading of the *Bartman* opinion does not support the conclusion urged by retirement boards. The *Bartman* court was concerned with the effect of a retroactive application of a judicial decision on cases not yet pending when the statute of limitations would make such claims untimely. (*Id.* at p. 786.) Thus, it did not hold that

an action had to be pending for a judicial decision to have retroactive effect but that " '[t]he normal "retroactivity" of most civil decisions has never been thought to supersede the operation of the statute of limitations so as to revive old claims which were not pursued because of a previously prevailing contrary rule of law, or to reincarnate dead causes which had fallen to the sword of the statute.' [Citation.]" (*Ibid.*)

Retirement boards' citation to *Newman, supra,* 48 Cal.3d 973, is equally unsound. They argue that the Supreme Court in *Newman* determined that its holding in *Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], was retroactive but, according to retirement boards, "only to 'all cases not yet final on January 30, 1989, the date that decision became final.' " Thus, they claim that the *Foley* decision had retroactive effect only on those cases pending at the time it became final. The *Newman* court, however, did not so limit the *Foley* holding; rather it was merely pointing out that *Foley* "is fully retroactive, applying to all cases not yet final as of January 30, 1989, the date our decision in *Foley* became final." (*Newman, supra,* 48 Cal.3d at p. 976.) By inserting the word "only" prior to the quoted language from *Newman,* retirement boards imply that the court was in some manner limiting its retroactive application of *Foley.* Clearly, it was not. Moreover, retirement boards omitted the language at the beginning of the sentence stating that the decision "is fully retroactive." (*Newman,* at p. 976.) Since *Foley* involved tort claims, the *Newman* court obviously did not have to be concerned about lawsuits filed after *Foley* became final; the prospective application of *Foley* would govern these cases.

Accordingly, retirement boards' attempt to create a new rule that retroactivity does not apply to them simply because none of the parties in this coordinated action had filed a pleading on this issue at the time the *Ventura* decision became final is wholly without merit.

## C. *Considerations of Fairness Based on Vested Contract Interests*

Both counties and retirement boards contend that retroactivity should not apply because pensions are contract rights. Counties maintain that retroactive application of *Ventura* would unconstitutionally impair contract expectations.[11] (See, e.g., *Kern v. City of Long Beach* (1947) 29 Cal.2d 848, 853

---

[11] This argument of impairment of contract seems somewhat disingenuous in light of retirement boards' and counties' decisions to apply the *Ventura* decision to all compensation earned after October 1, 1997. There is no evidence or reason to assume that these employees, who will now contribute and receive benefits as mandated under the proper construction of CERL, had any different expectations regarding their pensions than those who retired prior to October 1, 1997. Employees retiring after October 1, 1997, but hired prior to that date, will therefore suffer the precise "impairment" of contract that counties and retirement boards claim

[179 P.2d 799] (*Kern*) [pension rights involve "obligations which are protected by the contract clause of the Constitution"].) They argue that counties and plan members entered into employment arrangements based on pre-*Ventura* rules of law. A new decision will not be applied "to impair contracts made or property rights acquired in accordance with the prior rule." (*Propst, supra,* 50 Cal.3d at p. 462; see also *Houghton v. City of Long Beach* (1958) 164 Cal.App.2d 298, 311 [330 P.2d 918]; *Abbott v. City of Los Angeles* (1958) 50 Cal.2d 438, 455 [326 P.2d 484] (*Abbott I*).) " ' "[W]here a … statute has received a given construction by a court of last resort, and contracts have been made or property rights acquired in accordance with the prior decision, neither will the contracts be invalidated nor will vested rights be impaired by applying the new rule retroactively. [Citation.]" [Citation.]' [Citation.]" (*Newman, supra,* 48 Cal.3d at p. 982; see also *Faus, supra,* 48 Cal.2d at pp. 680–681.) These vested rights are defined by the benefits and law in place when an employee is rendering services, not by changes that occur after retirement. (*Betts v. Board of Administration* (1978) 21 Cal.3d 859, 866 [148 Cal.Rptr. 158, 582 P.2d 614].)

It is true that "California is firmly committed to the proposition that [public employees' retirement rights] are contractual; that they are 'vested' in the sense that the lawmakers' power to alter them after they have been earned is quite limited." (*Lyon v. Flournoy* (1969) 271 Cal.App.2d 774, 779 [76 Cal.Rptr. 869].) " '[T]he right to a pension becomes a vested one upon acceptance of employment by an applicant.' " (*Kern, supra,* 29 Cal.2d at p. 852.) Although "upon acceptance of public employment [an employee acquires] a vested right to a pension based on the system then in effect" (*Miller v. State of California* (1977) 18 Cal.3d 808, 817 [135 Cal.Rptr. 386, 557 P.2d 970]), the " 'amount, terms and conditions of the benefits may be altered' " (*Lyon v. Flournoy, supra,* at p. 780). "The contractual basis of a pension right is the exchange of an employee's services for the pension right offered by the statute." (*Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 662 [6 Cal.Rptr.2d 77].)

Counties maintain that they entered into employment arrangements with plan members and retirement boards administered their pension plans under pre-*Ventura* rules of law. Indeed, the trial court specifically found that retirement boards and counties relied on the law as stated in *Guelfi*. " 'The parties are presumed to have had existing law in mind when they executed their agreement ….' [Citation.] 'Existing law' includes decisions of the appellate courts interpreting statutes. [Citations.]" (*California Assn. of Highway Patrolmen v. Department of Personnel Admin.* (1986)

---

should bar any retroactive application of the *Ventura* decision to those employees retiring prior to October 1, 1997.

185 Cal.App.3d 352, 364 [229 Cal.Rptr. 729] (*CAHP*).) They contend that *Allen v. Board of Administration* (1983) 34 Cal.3d 114 [192 Cal.Rptr. 762, 665 P.2d 534] (*Allen*) "cements the point" that retroactive relief is improper.

In *Allen*, retired legislators or their surviving spouses maintained that they were entitled to the benefit of legislation passed after their retirement even though the legislation stated that the increased salaries could not be used as a basis for calculating retirement benefits for any legislators who retired prior to the amendment. (*Allen, supra,* 34 Cal.3d at pp. 117–118.) The retirees argued that the subsequent legislation impaired their contractual right to a pension based on a percentage of current comparative salaries. (*Ibid.*) The court held that there was no unconstitutional impairment because this was an unforeseen change in the law and the legislators could not have had a realistic expectation of such increases when they were legislators. (*Id.* at pp. 124–125.) Further, the court reasoned, "a fiscal consideration provides additional support for rejection of [retirees'] claim.... [¶] It thus becomes apparent that payment to [retirees] of inflated retirement allowances ... not only would give to them a bonanza far outstripping any reasonable expectation for cost-of-living increases ... but also would afford them pensions dwarfing their relatively modest contributions to the [retirement system]." (*Id.* at p. 125.)

Similarly here, counties argue, plan members are seeking to alter their pension contracts and obtain a windfall by claiming an entitlement to an increased pension based upon a change in the law after they retired. Counties maintain that it does not matter that *Allen* considered a statutory change while the situation here involves a judicial change in the law.

The question in *Allen,* as well as in *United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095 [259 Cal.Rptr. 65], which counties cite in a footnote, was whether the plan members' vested pension rights could be modified. Modifications of vested pension rights, to avoid violating the contract clause, "must be reasonable, must bear a material relation to the theory and successful operation of a pension system, and, when resulting in disadvantage to employees, must be accompanied by comparable new advantages." (*Allen, supra,* 34 Cal.3d at p. 120.) Here, there was no modification of plan members' vested pension rights; there was a correction to an erroneous construction of the statute after the plan members retired.

Although counties vigorously argue to the contrary, there was no change in the law and therefore there was no change to a plan member's vested right. Rather, counties agreed to implement a pension plan under CERL. During the relevant time period, the statutes remained the same, but our Supreme Court

in 1997 concluded that retirement boards had implemented "an erroneous construction of the applicable statutes ...." (*Ventura, supra,* 16 Cal.4th at p. 507.) Retirement boards and counties had not relied on the ruling of a court of last resort, but on the construction of a statute by a Court of Appeal. Accordingly, the narrow exception to the general rule of retroactivity based on the making of contracts in reliance of the interpretation of a statute " ' "by a court of last resort" ' " (*Newman, supra,* 48 Cal.3d at p. 982) does not apply.[12]

Since "[i]t is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law" (*Faus, supra,* 48 Cal.2d at pp. 680–681 ), the effect of the *Ventura* decision was that *Guelfi* never was the law.[13] Retirement allowances calculated prior to October 1, 1997 were based on "an erroneous construction of the applicable statutes" (*Ventura, supra,* 16 Cal.4th at p. 507) and were not incorrect because of a subsequent change in the law.

In their reply brief, counties rely extensively on *CAHP, supra,* 185 Cal.App.3d 352, but that appellate opinion does not contradict the foregoing rule. Rather, *CAHP* addresses a different situation. In *CAHP,* the highway patrol officers and the state had entered into a written memorandum of understanding (MOU), which stated that only "ordered overtime" was to be compensated. (*Id.* at pp. 356–362.) At the time the MOU was negotiated, a Court of Appeal had defined the period during lunch as not "ordered overtime." (*Id.* at pp. 362–363, citing *Fowler v. State Personnel Bd.* (1982) 134 Cal.App.3d 964, 970 [185 Cal.Rptr. 292].) Subsequently, after the execution of the MOU, our Supreme Court held "that rules and regulations of the City of Madera mandated that overtime be paid to police officers for their

---

[12] This does not settle the question of contracts made in reliance on the *Guelfi* holding under the detrimental reliance and public policy exception to retroactivity (see pt. II.D.).

[13] Counties argue that *Ventura* represented a change of law, because the Supreme Court denied review of *Guelfi.* They quote the following language from a Court of Appeal opinion and cite a number of cases quoting this language: "[W]hen the precise question of law has been decided by a District Court of Appeal and the Supreme Court has denied a hearing, such decision will be followed as settling the law ...." (*Housing Authority v. Peters* (1953) 120 Cal.App.2d 615, 616 [261 P.2d 561].) However, they omit critical language at the end of the sentence: "in the absence of a later decision of the Supreme Court overruling or modifying the prior case." (*Ibid.*) Here, there was a Supreme Court decision overruling the prior Court of Appeal opinion. The Supreme Court has expressly stated that, although its denial of review has significance, that is not the same as having ruled on the issue: "Although this court's denial of a hearing is not to be regarded as expressing approval of the propositions of law set forth in an opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of this court [citations], it does not follow that such a denial is without significance as to our views [citations]." (*DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 178 [18 Cal.Rptr. 369, 367 P.2d 865].)

mealtimes because of numerous restrictions on the officers' freedom during these times." (*CAHP, supra,* at p. 357, citing *Madera Police Officers Assn. v. City of Madera* (1984) 36 Cal.3d 403, 413 [204 Cal.Rptr. 422, 682 P.2d 1087] (*Madera*).)

Following the Supreme Court's ruling in *Madera*, the highway patrolmen in *CAHP* sued to have their lunchtime considered as overtime. (*CAHP, supra,* 185 Cal.App.3d 352.) The reviewing court noted that the officers derived whatever rights they had from the MOU, and their right to overtime "must be located in the MOU." (*Id.* at pp. 358, 361.) The MOU unambiguously denied them compensation for anything other than "ordered overtime" and, at the time of the contract, the parties did not intend or interpret the lunch period as "ordered overtime." (*Id.* at pp. 358–362.) The *CAHP* court held that the Supreme Court's *Madera* decision had no bearing on the interpretation of the MOU and therefore no effect on the officers' claim that they were owed compensation for their work during lunchtime. (*CAHP,* at p. 361.) It also noted that nothing in the Supreme Court decision (in *Madera*) indicated that the earlier Court of Appeal decision (in *Fowler*) had interpreted any statute unlawfully or against public policy. (*CAHP,* at p. 364.) Accordingly, the *CAHP* court concluded: " ' "A subsequent decision of a higher court, in a different case, giving a different exposition to a point of law from the one declared and known, when a settlement between parties takes place, cannot have a retrospective effect and overturn such settlement." ' [Citations.]" (*Id.* at pp. 364–365.)

The *CAHP* court was concerned with the interpretation of a term in a contract, while we are concerned with the construction of a statute. In discerning the intent of the parties, the *CAHP* court looked to the prevailing definition or interpretation of "ordered overtime" at the time the parties executed the agreement. (*CAHP, supra,* 195 Cal.App.3d at p. 364 [" 'The parties are presumed to have had existing law in mind when they executed their agreement' "].) In contrast, here our Supreme Court did expressly overrule the earlier Court of Appeal decision and held that the earlier ruling was an *unlawful construction of the statute*; thus, *CAHP* is unhelpful regarding the issue before us.

Rather than being concerned with the interpretation of a term in a contract, we are concerned about the effect of miscalculating a pension because of an incorrect construction of a statute. ■ When retirement allowances have been improperly calculated, courts have held that the pensions should be recalculated and the affected plan participants should receive retroactive relief, assuming the relief is timely. (See, e.g., *Marin Firefighters, supra,* 30 Cal.App.4th 1638; *Terry, supra,* 41 Cal.2d 698; *Dunham v. City of Berkeley, supra,* 7 Cal.App.3d 508; *Abbott II, supra,* 178 Cal.App.2d 204.)

Retirement boards do not have the discretion to exclude items from the calculation that they have determined meet the statutory definition of "compensation earnable." (*Marin Firefighters, supra,* at p. 1646, 36 Cal.Rptr.2d 736.) In *Marin Firefighters,* the Board of Retirement of the County of Marin adopted the opinion of its attorney that holiday pay was mandatorily includable as "final compensation" in determining pensions. (*Id.* at p. 1644.) After correcting the mistake only for prospective retirees, the firefighters association sued. (*Ibid.*) The Court of Appeal held that the corrected calculation had to be applied retroactively. (*Id.* at p. 1648.)

Similarly, our Supreme Court ordered that a mistake in the calculation of a pension be corrected retroactively in *Terry, supra,* 41 Cal.2d 698. In *Terry,* a retired mounted patrolman asserted that he was entitled to a percentage of the actual compensation then being paid to his position's rank (a fluctuating pension), but he had been paid a percentage of the amount he had actually earned during the relevant time period immediately prior to his retirement (a fixed pension). (*Id.* at p. 699.) The court noted that it did not matter that four years after the patrolman retired an amendment to the statute created a right to a fixed pension. "The pension payments are in effect deferred compensation to which the pensioner becomes entitled upon the fulfillment of the terms of the contract which may not be changed to his detriment by subsequent amendment. [Citations.]" (*Id.* at p. 703.) Accordingly, he was entitled to have his pension calculated pursuant to the operative statute at the time of his retirement. (*Ibid.*)

In *Dunham v. City of Berkeley, supra,* 7 Cal.App.3d 508, the court interpreted and applied the same fluctuating pension provision addressed in *Terry.* The court considered whether retired police officers should receive an increased pension based on salary increases associated with a different ranking classification and a new career incentive program that were created after they retired. (*Dunham, supra,* at p. 511.) The Court of Appeal agreed with the lower court's ruling that the new system added salary groupings within each rank rather than creating new ranks (*id.* at p. 513); to deny the plaintiffs these increases would "defeat the purpose of the fluctuating pensions system in maintaining parity between retired and active employees." (*Id.* at p. 516.) The Court of Appeal affirmed the judgment that ordered the city to pay past accrued and unpaid benefits. (*Id.* at p. 517.)

Finally, in *Abbott II, supra,* 178 Cal.App.2d 204, the court considered, among other things, whether the salary calculated for pensions should include "longevity" or "merit pay." (*Id.* at pp. 211–213.) The court concluded: "We think that longevity and merit pay constitute a part of the 'salary attached to the rank or position' formerly held by the retired or deceased members and that it was error for the court to disregard them in its computation of the

pensions to be paid and the judgments awarded." (*Id.* at pp. 213–214.) The court determined that the pensions had been calculated incorrectly and that the plaintiffs were entitled to "pensions and past due pension payments reflecting longevity and merit pay." (*Id.* at p. 216.)

Counties contend that none of the foregoing cases applies because in each of them the retirement board misapplied an existing law that was part of a plan member's pension contract. In contrast, here, they argue that retirement boards did not misapply an existing law; rather, *Ventura* changed the law. They argue that a mistaken application of existing law is significantly different from a judicial change in the law, and they quote the following from an old Supreme Court case: " 'Every man is to be charged at his peril with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind; and to permit a subsequent judicial decision in any one given case on a point of law to open or annul everything that has been done in other cases of the like kind for years before under a different understanding of the law, would lead to the most mischievous consequences.' " (*Kenyon v. Welty* (1862) 20 Cal. 637, 642.) They contend that plan members did not have any vested rights to the benefits claimed, and to undo these agreements regarding benefits because of a change in law would result in havoc, especially since these contributions were calculated on the basis of the benefits as defined by *Guelfi.*

As discussed *ante,* no change in the law occurred; CERL was not amended during the relevant time period. When quoting the particular section from *Kenyon v. Welty, supra,* 20 Cal. at page 642, counties fail to divulge that the court was considering whether to undo a contract that had been made according to a judicial law as articulated by the Supreme Court, because the contract was now invalid under a subsequent Supreme Court decision. (*Id.* at p. 641.) Another passage, not cited by the counties, clarifies that the court's decision not to disturb the contract was on the grounds that the contract had been made on an earlier, overruled, *Supreme Court* decision: "To establish the doctrine that all contracts made under a condition of the law, *as expounded by the Supreme Court of the State,* can be set aside if the Court subsequently changes its opinions or corrects its error, would be attended with very serious evils." (*Id.* at p. 642, italics added.) As already stressed, that is not the situation here. The Supreme Court had not addressed the definition of "compensation earnable" under CERL until its *Ventura* decision and, therefore, once the Supreme Court issued its decision in *Ventura,* the effect was that *Guelfi* never was the law. (See, e.g., *Faus, supra,* 48 Cal.2d at pp. 680–681.)

■ Judicial decisions do not establish a new rule of law for purposes of exclusion from the rule of retroactivity when the court " 'gave effect to a

statutory rule that the courts had theretofore misconstrued [citation] or had not definitively addressed [citation] ....' [Citation.]" (*McManigal, supra,* 166 Cal.App.3d at p. 981.) Thus, "prior misconstruction of a statute by the courts does not prevent the retroactive application of the Supreme Court's authoritative interpretation." (*Id.* at p. 982.) At the time plan members accepted employment, they received a vested right to a pension as mandated by CERL and intended by the Legislature. " '[T]he right to a pension becomes a vested one upon acceptance of employment by an applicant.' " (*Kern, supra,* 29 Cal.2d at p. 852.) Thus, the *Ventura* court concluded that the particular plaintiffs before it should not be denied the benefit of their decision simply because Ventura County had implemented "an erroneous construction of the applicable statutes." (*Ventura, supra,* 16 Cal.4th at p. 507.)

Further, an additional reason exists for rejecting counties' and retirement boards' arguments regarding violation of vested contract rights. The *Ventura* decision affected the determination of what items were to be included in "compensation earnable," and this is *not* subject to a contract right. As already stressed, counties and plan members entered into employment contracts, which included a right to a pension to be calculated as mandated by CERL. They did not bargain for the amount of "final compensation" or the amount of contributions and earnings that are necessary to fund the retirement allowances required by that formula.[14] Retirement boards may have set the contribution rates too low because of their miscalculation of "compensation earnable," but the parties did not negotiate contribution rates or final compensation. L.A. County separately argues that its plan members were repeatedly told by LACERA Board how their retirement benefits would be calculated, the interpretation of terms such as "compensation earnable," and their retirement benefits, which were calculated in accordance with *Guelfi*. However, plan members could not bargain regarding their contribution rates or their "final compensation." ▮ Once a retirement board sets contribution rates based upon the recommendation of its actuary, those rates are binding on the county. (See §§ 31584–31586; see also *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 49 [115 Cal.Rptr.2d 151] (*City of Oakland*) ["contribution rates are set by law"].)

Essential to counties' position, and repeatedly asserted by them in their briefs and at oral argument, is that plan members received pensions calculated in accordance with the law then in effect and they cite *Guelfi*. However, as stressed throughout this opinion, the law in effect at the time the plan members received their pensions was CERL, and plan members agreed to

---

[14] The issue of whether the pre-*Ventura* retirees should be entitled to benefits that include cash premiums when their contributions were not based on calculations to include such benefits is a fairness question—not a question of contract. We therefore address this issue in our discussion of fairness (see pt. II.D), which directly follows.

have their "compensation earnable" and "final compensation" calculated pursuant to CERL. The calculations made for plan members may have complied with the holding in *Guelfi*, but they were calculated incorrectly under CERL. *Guelfi* misstated the law; it did not establish any law. (See, e.g., *Newman, supra*, 48 Cal.3d at p. 979.) Thus, the contract right is the entitlement to the pension; statutes set the contributions and "final compensation" of plan members.

■ Accordingly, the law is well settled: Unless one of the exceptions to the retroactivity rule applies, any error in the calculation of a pension results in the retiree's receiving a pension based on the corrected mistake and any sums of money due on past payments. We next consider the fairness exception based on detrimental reliance and public policy.

### D. Considerations of Fairness Based on Detrimental Reliance and Public Policy

Retirement boards and counties contend that the fairness exception based on detrimental reliance and public policy requires reversal of the trial court's ruling that *Ventura* applies retroactively. Plan members respond that this is not a situation where the "hardships" of the case "draw it apart from the usual run of cases" (*Newman, supra*, 48 Cal.3d at p. 983) and of the basic rule of retroactivity.

California courts "have long recognized the potential for allowing narrow exceptions to the general rule of retroactivity when considerations of fairness and public policy are so compelling in a particular case that, on balance, they outweigh the considerations that underlie the basic rule." (*Newman, supra*, 48 Cal.3d at p. 983; see also *Smith v. Rae-Venter Law Group* (2002) 29 Cal.4th 345, 372–373 [127 Cal.Rptr.2d 516, 58 P.3d 367] [reliance on prior construction of fee-shifting statute had only prospective application where party reasonably relied on earlier interpretation in weighing the potential costs of unsuccessfully appealing commissioner's award].) "Considerations of fairness would measure the reliance on the old standards by the parties or others similarly affected, as well as 'the ability of litigants to foresee the coming change in the law ....' [Citation.]" (*Peterson, supra*, 31 Cal.3d at p. 153.) "Public policy considerations include the purpose to be served by the new rule, and the effect on the administration of justice of retroactive application." (*Ibid.*)

#### 1. Detrimental reliance

The trial court stated that retirement boards established that the contributions into the retirement systems collected from the employees and the

counties were calculated in reliance on *Guelfi.* The pension plans are funded on an actuarial basis and therefore determinations of contribution rates relate to determinations of those items included in a calculation of the "compensation earnable" and "final compensation."

The trial court also found that retirement boards and counties established that they could not foresee the Supreme Court's ruling in *Ventura.* Plan members dispute this finding and assert that the practice set forth in *Guelfi* was not that widespread. Thus, for example, the declaration of the chief executive officer for the San Mateo County Employees' Retirement Association indicated that San Mateo County, prior to the *Ventura* decision, included in its pension calculations items of pay not automatically provided in a uniform amount to all employees in the same grade or class of positions, such as night shift differential pay, helicopter observer pay, desk duty pay, and investigative work pay. In addition, LACERA members argue that as early as 1993 counties and retirement boards knew that liaison counsel were litigating the validity of *Guelfi.* They also point out that employees successfully sued the City of Hayward and the State Public Employees Retirement System to include certain fringe benefits in the salary base from which their retirement pension allowances were computed (*Rose v. City of Hayward* (1981) 126 Cal.App.3d 926 [179 Cal.Rptr. 287]), and that the decision has been applied retroactively.

The record, however, supports the trial court's finding that counties and retirement boards reasonably relied on *Guelfi.* No other Court of Appeal decision contradicted its holding and the Supreme Court had not granted review of *Guelfi.* The critical question therefore is whether their reliance on *Guelfi* resulted in substantial detriment or hardship.

Retirement boards and counties must establish that they have "forgone substantial benefits" in reliance (*Propst, supra,* 50 Cal.3d at p. 464) on the rule set forth in *Guelfi.* (See also *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 509 [87 Cal.Rptr.2d 702, 981 P.2d 543] [must establish "substantial detrimental reliance" for exception to retroactivity rule].) In *Propst,* our Supreme Court reversed a judicially developed rule that had prohibited the unilateral severance of a joint tenancy in personal property. (*Propst,* at pp. 461–462.) The court noted that this rule had been unforeseeable to counsel, since the Supreme Court had earlier applied the former rule (e.g., *In re Kessler* (1932) 217 Cal. 32 [17 P.2d 117]) and had not indicated that it was planning to overturn it. (*Propst,* at pp. 463–464.) The court, however, doubted that many lay persons had detrimentally relied on the former rule, but it noted "there may be instances of persons who have incurred legal obligations or forgone substantial benefits in reasonable reliance" on the prior rule against unilateral severance. (*Id.* at p. 464.) It therefore remanded to permit individuals to establish detrimental reliance. (*Id.* at pp. 464–465.)

██ A review of those California cases that have refused to apply a judicial rule retroactively on the grounds of hardship indicates that this exception is generally imposed when retroactivity jeopardizes a legal right. To preserve people' s legal claims, our Supreme Court has sometimes refused to apply a decision overruling its own earlier opinion to cases already filed. (E.g., *Camper v. Workers' Comp. Appeals Bd.* (1992) 3 Cal.4th 679 [12 Cal.Rptr.2d 101, 836 P.2d 888]; *Moradi-Shalal, supra,* 46 Cal.3d 287.) ██ In particular, "[r]etroactive application of an unforeseeable procedural change is disfavored when such application would deprive a litigant of 'any remedy whatsoever.' [Citations.]" (*Woods v. Young* (1991) 53 Cal.3d 315, 330 [279 Cal.Rptr. 613, 807 P.2d 455] [interpretation of notice provision and effect on statute of limitations applied prospectively because retroactive application would bar plaintiffs' actions regardless of merits]; see also *Camper, supra,* at p. 689; *Smith v. Rae-Venter Law Group, supra,* 29 Cal.4th at pp. 372–373.) Our Supreme Court in *Moradi-Shalal* limited the retroactive application of its decision that reconsidered and overruled its prior holding that an insured or third party claimant had a private cause of action against insurers who engage in unfair claims settlement practices. (*Moradi-Shalal, supra,* 46 Cal.3d at pp. 294, 305.) The court cautioned that it was not "implying any broad exception to the general rule of retrospectivity," but in "the interest of fairness to the substantial number of plaintiffs who have already initiated their suits in reliance" on its previous opinion, it refused to apply the new decision to those claims filed before its overruling decision became final. (*Id.* at p. 305.) In contrast, here the retroactive application of *Ventura* would not result in the loss of any legal claims by counties or retirement boards.

Our Supreme Court has also considered financial and administrative issues when assessing a claim of hardship. In *Green v. Obledo,* the Supreme Court determined that the class plaintiffs were entitled to welfare benefits, but it remanded for the trial court to consider, upon the proper motion, the appropriate date for payment of retroactive welfare benefits. (*Green v. Obledo, supra,* 29 Cal.3d at p. 143.) The following factors were to be considered by the trial court when making its equity determination: "[A]n action by an entire class to recover past welfare benefits withheld pursuant to an invalid regulation or statute might impose, in some circumstances, a disproportionate clerical and financial burden on the governmental entity if such benefits were ordered paid for the entire period of limitations. This could occur, for example, if the regulation or statute had been in force for a number of years at the time of the judgment, if the class were particularly large, or if the potential individual recovery of each class member were small." (*Id.* at p. 142; see also *Smith v. Rae-Venter Law Group, supra,* 29 Cal.4th at p. 373 [retroactive application would affect all pending appeals from commissioner's decisions that relied on different definition of successful

litigant under fee-shifting statute]. ) Here, there was no showing that the class was particularly large or that the individual recovery for each class member was small, but see our discussion below (pt. II.D.1.a.) for any alleged fiscal impact.

In the contract context, Division Four of this court considered whether a judicial decision that a contracting party's right to refuse consent to an assignment must be exercised in accordance with standards of commercial reasonableness and good faith should be applied retroactively. (*Kreisher v. Mobil Oil Corp.* (1988) 198 Cal.App.3d 389 [243 Cal.Rptr. 662] (*Kreisher*).) At the time the franchisor refused consent, the contract between the franchisee and franchisor gave the franchisor the express right to refuse its consent to a proposed transfer of plaintiff's franchise and the Supreme Court had not yet issued its ruling that the franchisor could not withhold its consent in an arbitrary or unreasonable manner. (*Id.* at p. 395.) As a result of the refusal (and prior to the Supreme Court's holding that the refusal could not be arbitrary or unreasonable), plaintiff filed a lawsuit against the franchisor and the jury awarded the plaintiff both compensatory and punitive damages. (*Id.* at p. 394.) The *Kreisher* court concluded that our Supreme Court's ruling should not have retroactive application in this situation, and it explained: "As regards the fairness factor, we perceive no satisfying basis for making plaintiff the windfall beneficiary of a change he did not foresee or help bring about. Conversely, it is patently unfair to penalize Mobil for its nonconformity with standards which took effect only after it conscientiously determined the state of the law and relied upon it in reasonable good faith." (*Id.* at p. 404.)

Similarly, here, counties and retirement boards contend that the retroactive application of *Ventura*, while it would not deprive anyone of any legal rights, would be unfair because it would have a negative economic impact on the system, would result in a windfall for retirees who expected their pensions to be based on the rule in *Guelfi*, and would be unfair to current and future taxpayers who would have to pay for the added liabilities. We review each of these complaints.

### a. *Adverse fiscal impact*

Retirement boards and counties assert the trial court found that if *Ventura* were applied retroactively, five counties would incur a total of over $500 million in unfunded liabilities. (Orange County would incur $211 million; L.A. County would incur $190 million; Ventura County, which is not a party to these appeals, would incur $30 to $40 million; and Stanislaus County would incur $35 million. The fifth county, Kern, is not a party to these consolidated appeals and the record does not disclose the actual amount of

unfunded liability it would incur.)[15] However, underfunding, in itself, does not establish hardship. The *Ventura* court noted that there "may be unanticipated costs to [the county] if the pensions of the individual [plan members] and the employees the association represents must be recalculated and adjusted upward. If so, to comply with the financial provisions of CERL (§ 31580 et seq.) and accommodate future increases, the county may have to make a supplemental appropriation and adjust the future annual appropriation for its contribution to the pension fund to cover the increase in future retiree pensions that results from inclusion of additional items of 'compensation' in 'compensation earnable.' Past experience should enable the county to anticipate the number of employees who will receive premium pay, however, and adjustments of this nature are contemplated by CERL. (See §§ 31453, 31454.)" (*Ventura, supra,* 16 Cal.4th at p. 507.)[16]

The trial court pointed out that there was no evidence that the underfunding would in any way jeopardize the financial integrity of any retirement system. It found: "To the contrary, the evidence shows that the retirement systems in these five counties have substantial surpluses available and the unexpected liability created by application of *Ventura* to past retirees will not substantially impact their financial stability."[17] Indeed, financial difficulties resulting from a judicial decision are not the type of hardship that typically has prevented retroactive application. (See, e.g., *McBrearty v. City of Brawley* (1997) 59 Cal.App.4th 1441, 1448–1449 [69 Cal.Rptr.2d 862], disapproved on other grounds in *Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 816–817 [107 Cal.Rptr.2d 369, 23 P.3d 601].) In *McBrearty*, the court refused to limit the application of a California Supreme Court decision validating provisions of Proposition 62, which required voter approval of a tax. The *McBrearty* court applied the Supreme

---

[15] Of these counties, only L.A. County is challenging the retroactivity issue.

[16] Retirement boards argue that the language of "future retiree pensions" and "number of employees who will receive premium pay" in *Ventura* establishes that the court recognized that the financial readjustment was to be prospective. They claim that a person "who has already retired cannot be a 'future retiree' nor can he [or she] be an employee who 'will receive' premium pay." However, the entire passage suggests that the court was referring to the unanticipated costs resulting from granting retroactive relief to the parties before it as well as accommodating future increases. It appears in the context of the entire passage that, when referring to "future retiree pensions," the court was referring to future pensions of retirees and not to future retirees. As to the language referring to "employees who will receive premium pay," the court appears to be referring to future retirees, since it was concerned with future adjustments. Accordingly, this language does not indicate that the court had concluded that the readjustment was to be prospective; indeed, the court expressly declined to reach the question of the retroactive application of its holding to other plan members in other counties (*Ventura, supra,* 16 Cal.4th at p. 507).

[17] L.A. County argues that LACERA's surplus has now dropped significantly. The amount of its surplus was a factual question weighed and considered by the trial court. We will not reweigh that evidence.

Court's holding retroactively and invalidated a city utility tax imposed without voter approval despite concluding that the city had reasonably and justifiably relied on a prior Court of Appeal decision finding the proposition unconstitutional and despite acknowledging that retroactive application may impact the city's financial condition. (*McBrearty*, at p. 1449.) The court explained: "In this situation, the existence of prospective financial difficulties resulting from the implementation of the voter approval requirement does not constitute a legally cognizable hardship. [Citation.] Because the City has not established that conditioning the *future* collectibility of the utility tax on voter approval will create substantial inequitable results or cause undue financial hardship apart from those the challenged tax was intended to alleviate, we find that this does not establish a basis on which to conclude that [the Supreme Court case] is inapplicable." (*Ibid.*)

Similarly, here, the possibility of future financial difficulties was anticipated by the Legislature when it enacted CERL. ▮ Where underfunding occurs because a retirement board mistakenly miscalculates pension benefits, the board is authorized to collect both arrears contributions and interest for the period in question. (*Barrett v. Stanislaus County Employees Retirement Assn.* (1987) 189 Cal.App.3d 1593 [234 Cal.Rptr. 900] (*Barrett*).) As the trial court here found, underfunding can occur for a number of reasons and "[a]ctuarial methodology is designed to address and consider unforeseen events on a regular basis so as to ensure the financial integrity of the retirement system." ▮ Indeed, CERL itself *requires* that each actuary for the retirement system conduct a formal actuarial valuation "within one year after the date on which any system … becomes effective, and thereafter at intervals not to exceed three years." (§ 31453; see also § 31454.)[18] The actuary is therefore required to conduct a new valuation of the retirement

---

[18] Section 31453 provides: "An actuarial valuation shall be made within one year after the date on which any system established under this chapter becomes effective, and thereafter at intervals not to exceed three years. The valuation shall be conducted under the supervision of an actuary and shall cover the mortality, service, and compensation experience of the members and beneficiaries, and shall evaluate the assets and liabilities of the retirement fund. Upon the basis of the investigation, valuation, and recommendation of the actuary, the board shall, at least 45 days prior to the beginning of the succeeding fiscal year, recommend to the board of supervisors such changes in the rates of interest, in the rates of contributions of members, and in county and district appropriations as are necessary. With respect to the rates of interest to be credited to members and to the county or district, the board may, in its sound discretion, recommend a rate which is higher or lower than the interest assumption rate established by the actuarial survey. No adjustment shall be included in the new rates for time prior to the effective date of the revision."

Section 31454 reads: "The board of supervisors shall not later than 90 days after the beginning of the immediately succeeding fiscal year adjust the rates of interest, the rates of contributions of members, and county and district appropriations in accordance with the recommendations of the board, but shall not fix them in such amounts as to reduce the individual benefits provided in this chapter."

system at least every three years and determine the extent to which prior assumptions must be changed.

Retirement boards maintain that unforeseen events that must be considered do not include allowing for changes in the law that will result in changes for "thousands of retirees as well as active members." As discussed *ante,* there was no change in CERL; rather, calculations for pensions had been computed incorrectly because of an improper interpretation of the statute. There is no reason why this unforeseen event falls outside the statutes governing adjustments for underfunding.

A county actuary, and retirement boards' designated expert, Ira Summer, admitted that there are "unanticipated ... blips either one way or another," but maintained that "the blips up and the blips down should cancel each other out over the long term for all people in [the retirement] system." Because blips occur, actuaries are equipped to address them. One approach is to actuarially smooth the blips by amortizing changes in contribution rates over a varying number of years. Another approach is to change the interest assumption rates, asset valuation methods, or mortality tables used by the retirement system. Some counties, such as Orange and Alameda Counties, have addressed the blips by issuing pension obligation bonds to pay off their unfunded actuarial accrued liabilities to the retirement systems. Finally, another method is to hold excess investment earnings of the retirement system as a reserve against future "deficiencies in interest earnings in other years, losses on investments, and other contingencies." (§ 31592.) There is no reason why underfunding because of a misapplication of the law cannot be addressed by the "actuarial methodology" employed by the pension administrators.

Since we conclude that the trial court did not abuse its discretion in finding no hardship based on fiscal impact on the system, we now consider hardship based on "substantial inequitable results."

b. *Inequitable results*

Counties and retirement boards contend that the retroactive application of the *Ventura* decision will result in some plan members receiving a windfall, which is unfair to other taxpayers and innocent parties.

As to the claim that retroactive application of the *Ventura* decision will result in a windfall to retirees who never, according to counties and retirement boards, expected their pensions to be calculated in the manner set forth in *Ventura,* we disagree. Plan members contracted to receive a pension as required by CERL and therefore they are entitled to the amounts *properly* calculated under these statutes. While it may be true that retirement boards

may not be able to collect the full amount owed by all former employees, we agree with the trial court that "the counties have made absolutely no showing that the deficiency will be significant or will have any lasting impact on the finances of the county." In addition, counties and retirement boards are not going to be penalized; rather, as already discussed, CERL provides for flexibility and adjustments (see §§ 31453, 31454).

Counties and retirement boards complain that the retroactive collection of contributions shifts the responsibility for liabilities onto a future generation of taxpayers in violation of the public policy favoring "intergenerational equity"; they cite *Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1139–1140 [61 Cal.Rptr.2d 207] (*Wilson*) as setting forth this policy. They claim that county retirement systems operating under CERL calculate contributions and earnings to prefund the cost of members' pensions by the members' anticipated retirement dates. The purpose of the prefunding, according to counties and retirement boards, is to ensure benefit security for the employees and to ensure that the costs of providing them are borne by the taxpayers who are receiving the benefit of the public employees' services rather than being shifted to future generations of taxpayers. Counties maintain that retroactively imposing on today's taxpayers a newly created legal liability for service rendered to past generations of taxpayers violates this alleged policy of "intergenerational equity."

Counties' and retirement boards' reliance upon *Wilson, supra,* 52 Cal.App.4th 1109, is misplaced. First, counties and retirement boards maintain that *Wilson* holds that a fundamental policy underlying actuary defined pension systems is "intergenerational equity," but all references to this term (or variations of it) in the opinion were quotes from declarations by expert actuaries. (*Id.* at pp. 1139–1142.) The court never stated that there was a policy of "intergenerational equity." Second, the *Wilson* court was concerned with whether legislation delaying the employer's payment of required contributions impaired the vested contractual rights of members to an actuarially sound pension system. The case said nothing about the proper methods for imposing retroactive relief and therefore it has little relevance to the issues before us.

Counties and retirement boards also rely on statements by actuary Ira Summer. Summer stated that payment of missed contributions alone would be insufficient to restore these systems to where they would have been had the contributions been collected on a timely basis because they will not be equal to lost earnings. Since they will receive the contributions later than expected, retirement boards will not have the opportunity to invest these funds. Summer explained that when contributions are invested over the working lifetime of a plan member, between 65 and 80 percent of the

payments made to that member come from investment return. Consequently, counties and retirement boards claim, county contributions by current and future taxpayers will increase unless interest is added to compensate for the lost earnings.

Further, counties assert, even if interest were collected on the arrears contributions, the systems still would not be fully restored to where they would have been. Although the contributions can be increased and collected with back interest, the opportunity to earn additional funds on the increased contributions has been irretrievably lost.

As to this latter argument, any lost opportunities are offset entirely by the retirement boards' ability to earn excessive investment income from monies they should have paid out in pension benefits had CERL been applied properly. Indeed, in *City of Oakland,* the city complained that the retroactive reclassification of certain employees would cause unexpected liabilities. (*City of Oakland, supra,* 95 Cal.App.4th 29.) The court explained: "[R]eclassifications generally result in increased liability on the part of the employer, who presumably had the use of money that should have been funding the correct retirement benefits all along. While the reclassification decision here will apparently result in an unanticipated financial liability on the City's part, the City has had the use of money it should have been expending towards the retirement system, and we see nothing in the applicable legislation which cuts off the City' s liability therefor." (*Id* at pp. 54–55.)

Further, retirement boards and counties have received a significant windfall because the three-year statute of limitations (Code Civ. Proc., § 338, subd. (a)) will relieve them of the obligation to pay a significant portion of the benefits owed under the statute to some of the retirees. Permitting them to increase their windfall by applying the *Ventura* decision on only a prospective basis would be unfair to those people who retired prior to October 1, 1997, since they also had a vested interest in having their pensions calculated as mandated by CERL.

Finally, retirement boards and counties assert that retroactive application will place an unfair hardship on innocent plan members. The trial court authorized the retirement boards to collect arrears contributions and interest from the counties and the parties bringing this lawsuit. If the retirement boards implemented a full retroactive recalculation of compensation earnable, they could collect arrearages on past contributions from these retirees' first day of employment. (See §§ 31622, 31639.3.) Even for those retirees who had premium pay items in their final compensation period, the statute of limitations permits payment to them for only the three years prior to the filing

of their lawsuit (Code Civ. Proc., § 338, subd. (a)). They would, however, still owe contributions plus interest from their first date of employment. The retirees whose pensions will not increase will also owe back contributions if they received premium cash pay while working but not during the time period of their final average salary.[19]

In addition, retirement boards assert, those plan members who are still active employees will have to pay arrears contributions if the new definition of compensation earnable is retroactively recalculated. They argue, however, that they will receive no additional benefit because the retirement systems already changed the method of calculating compensation earnable for compensation earned after October 1, 1997, to comply with the *Ventura* decision.

This situation, retirement boards and counties maintain, is the same as the one in *Kreisher,* where the court concluded that it was "patently unfair to penalize Mobil for its nonconformity with standards which took effect only after it conscientiously determined the state of the law and relied upon it in reasonable good faith." (*Kreisher, supra,* 198 Cal.App.3d at p. 404.) *Kreisher,* however, is inapplicable. There, Mobil would have owed the plaintiff both compensatory and punitive damages because it had relied on a contract provision that it could withhold its consent in an arbitrary or unreasonable manner to a proposed transfer of the plaintiff's franchise. Thus, the costs to Mobil in compensatory and punitive damages were known and significant. Here, retirement boards provide little more than speculation as to how the collection of arrearages may be detrimental to innocent people. Further, they do not even attempt to set forth the number of affected people or the actual cost to them.

Accordingly, we conclude that counties and retirement boards have not met their burdens of proving that they will suffer a substantial hardship as a result of applying the *Ventura* decision retroactively. The trial court considered the evidence before it and found that the costs associated with correcting the mistake in calculation would not so dramatically affect the counties or the economy as to require an exception to our general rule of retroactivity, and we agree.

### 2. *Public policy*

As set forth earlier, considerations of public policy "include the purpose to be served by the new rule, and the effect on the administration of justice of

---

[19] We address the question of collecting retroactive contributions from members who will not receive retroactive benefits, as well as other contribution issues, in part III.

retroactive application." (*Peterson, supra,* 31 Cal.3d at p. 153.) Counties assert that applying *Ventura* retroactively will result in more litigation. They claim: "[A]ny decision to apply *Ventura* retroactively threatens to add tens of thousands of retirees to the administrative and judicial system—each with his or her own unique burden of proof. Moreover, this quagmire only will be thickened by the inevitable fact that the Counties will not have complete records to assist many of these retirees in meeting their burden."

We agree with plan members that the assertion that there will be more litigation is speculative. Further, and more significantly, courts concerned with the administration of justice have focused on the effect of the ruling on pending cases. (See, e.g., *Propst, supra,* 50 Cal.3d at p. 463, fn. 4 [reviewing court concluded there was no indication of any substantial number of pending cases involving issue of unilateral severance of joint tenancy in personal property and therefore "no effect on the administration of justice that might lead us to withhold retroactive application of our present decision"]; *Woods v. Young, supra,* 53 Cal.3d at pp. 330–331; *Moradi-Shalal, supra,* 46 Cal.3d at p. 305; *Newman, supra,* 48 Cal.3d at p. 992 258 Cal.Rptr. 592, 772 P.2d 1059, fn. omitted ["we do not believe that the number of retrials required by our decision today will seriously disrupt the administration of justice"].) Thus, for example, because it was concerned about the "administration of justice," our Supreme Court in *Li v. Yellow Cab Co., supra,* 13 Cal.3d 804 limited the retroactive application of its comparative negligence holding and applied this new rule only to cases where the trial had not yet begun. (*Id.* at p. 829.) If it had applied the *Li* holding retroactively to all cases, trial courts would have been compelled to retry essentially *all* the cases that had reached judgment but were not yet final at the time of the decision. This is because juries in these cases would not have been instructed to determine the respective negligence of the parties at trial. In contrast, the retroactive application of *Ventura* will not negatively impact the administration of justice by requiring courts to retry pending cases.

The administrative burden on L.A. County will be particularly acute, it maintains, because, as of 1997, there were 41,873 retired members of LACERA. Other than asserting that this will generate "some administrative burden" and that "many" of the retired members are "potential future litigants," L.A. County provides no evidence that this will pose a serious burden. Indeed, it is unclear how difficult it is to determine whether any of these individuals are entitled to increased benefits and, if so, how many. Accordingly, L.A. County has failed to meet its burden of establishing the administration of justice exclusion.

We therefore conclude that counties and retirement boards have failed to establish that retroactive application of *Ventura* will cause a flood of litigation. Retroactive application of the *Ventura* decision "reflects a policy in favor of paying employees what they earned. That is not inherently unfair. [Citation.]" (*City of Oakland, supra,* 95 Cal.App.4th at p. 54.)

E. *Federal Cases*

Counties and retirement boards contend that retroactivity is inappropriate in the pension context and cite a number of federal cases. (E.g., *Manhart, supra,* 435 U.S. 702; *Long, supra,* 487 U.S. at p. 237 ["We will not adopt the premise that the appropriateness of a retroactive award turns on a particular pension fund's current financial status, so that financially successful pension funds pay but financially insecure pension funds do not. To do so imposes a penalty for prudent management"];*Norris, supra,* 463 U.S. at p. 1092; *Retired Public Employees' Ass'n. v. State of Cal., supra,* 799 F.2d at pp. 514–515; *Probe, supra,* 780 F.2d 776.) ▆ Federal decisions, however, have limited relevance to whether our Supreme Court's decision, which interprets a California statute, should have retroactive application. As the United States Supreme Court has explained: "The determination whether a constitutional decision of this Court is retroactive—that is, whether the decision applies to conduct or events that occurred before the date of the decision—is a matter of federal law. When questions of state law are at issue, state courts generally have the authority to determine the retroactivity of their own decisions." (*American Trucking Assns., Inc. v. Smith* (1990) 496 U.S. 167, 177 [110 L.Ed.2d 148, 110 S.Ct. 2323].) No federally protected right is involved in this proceeding and the proper interpretation of CERL is purely a question of state law.

However, counties and retirement boards contend that many California courts have looked to federal law on the question of retroactivity, as articulated in *Chevron Oil Co. v. Huson* (1971) 404 U.S. 97, 106–107 [30 L.Ed.2d 296, 92 S.Ct. 349] (*Chevron*). (See, e.g., *Kreisher, supra,* 198 Cal.App.3d at p. 399, fn. 4; *Casas v. Thompson* (1986) 42 Cal.3d 131, 140 [228 Cal.Rptr. 33, 720 P.2d 921], overruled on another issue in *In re Marriage of Mansell* (1989) 217 Cal.App.3d 219, 226 [265 Cal.Rptr. 227]; *Citicorp North American, Inc. v. Franchise Tax Bd.* (2000) 83 Cal.App.4th 1403, 1423 [100 Cal.Rptr.2d 509].) In *Chevron,* the United States Supreme Court identified three relevant factors in determining whether to apply an overruling case retroactively: "First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied [citation], or by deciding an issue of first impression whose resolution was not clearly foreshadowed (*Chevron, supra,* at p. 106.)" The second factor considers whether in light of

the " 'history … purpose and effect' " of the rule in question its operation will be furthered or retarded by retrospective application. The third factor weighs "the inequity imposed by retroactive application" and whether it would produce " 'substantial inequitable results,…"injustice or hardship"….' [Citation.]" (*Chevron, supra,* at pp. 106–107.)

Some courts may have been guided by *Chevron* on the issue of retroactivity, but the federal cases upon which counties and retirement boards rely are a special category of cases that have considered retroactivity for federal pension cases *and* the implementation of Title VII (42 U.S.C. § 2000e-2(a)(1)). Thus, these cases are not simply concerned with retroactivity in the pension context, *but the unique circumstances of changes in pension plans as a result of the court's interpretation of the implementation of Title VII.* In *Manhart, supra,* 435 U.S. 702, the United States Supreme Court considered whether requiring female employees to make larger contributions than male employees to the pension fund violated Title VII. It determined that it did, but it gave its holding only prospective application. (*Manhart* at pp. 718–723.) The court noted that 50 million Americans participate in retirement plans other than Social Security and that "[d]rastic changes in the legal rules governing pension and insurance funds, like other unforeseen events, can have this effect. Consequently, the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result.… The [Equal Employment Opportunity Commission (EEOC)] itself has recognized that the administrators of retirement plans must be given time to adjust gradually to Title VII's demands. Courts have also shown sensitivity to the special dangers of retroactive Title VII awards in this field." (*Id.* at pp. 721–722, fn. omitted.) The court explained: "There can be no doubt that the prohibition against sex-differentiated employee contributions represents a marked departure from past practice. Although Title VII was enacted in 1964, this is apparently the first litigation challenging contribution differences based on valid actuarial tables. Retroactive liability could be devastating for a pension fund. The harm would fall in large part on innocent third parties." (*Id.* at pp. 722–723, fn. omitted.) The court stated that the harms would fall on innocent third parties because, if the contributions were recovered from the pension fund, administrators of the fund would be forced to meet unchanged obligations with diminished assets. Further, if the reserve was inadequate, "either the expectations of all retired employees will be disappointed or current employees will be forced pay not only for their own future security but also for the unanticipated reduction in the contributions of past employees." (*Id.* at p. 723.) All of the federal cases cited by counties and retirement boards involved Title VII pension cases and followed the ruling in *Manhart.* (*Long, supra,* 487 U.S. 223, 237; *Norris, supra,* 463 U.S. at p. 1092; *Retired Public Employees' Ass'n. v. State of Cal., supra,* 799 F.2d at p. 515; *Probe, supra,* 780 F.2d 776.)

The *Manhart* case and its progeny are not especially helpful to counties and retirement boards. The *Manhart* court was confronted with the "[d]rastic changes in the legal rules governing pension and insurance funds" as a result of Title VII and the "devastating" effect retroactive application would have. (*Manhart, supra,* 435 U.S. at pp. 721–722.) The impact was obvious; the court's ruling affected the contributions and benefits for *all* women. No such drastic result is implicated here. As already noted, counties and retirement boards have failed to establish "hardship" and, without such evidence, it is unclear that very many people will be affected. Not only does the *Ventura* decision impact only those particular employees that received a cash payment not ordinarily given to the class of employees of their rank, but the record does not establish that the resulting increase for these particular employees would be "devastating."

In addition, another clear difference between the federal cases and the ones before us is that the United States Supreme Court stated that the EEOC contemplated the gradual implementation of Title VII by administrators of pension plans (*Manhart, supra,* 435 U.S. at pp. 721–722) and therefore the holding in *Manhart* comported with Title VII objectives. That is not the case here. Indeed, as the *Ventura* court detailed, the intent of the Legislature, as revealed by the statutory history of CERL and the definitions of "compensation earnable" and "final compensation" in PERL, was to always include advantages paid in cash (excluding overtime) in the calculations of "final compensation" for pensions. (*Ventura, supra,* 16 Cal.4th at p. 504.)

Finally, the federal cases did not consider mistakes in calculations based on an erroneous interpretation of a statute, which is the situation before us. Rather, the federal cases were concerned with correct calculations based on actuarial tables that unlawfully distinguished between men and women.

It is also unclear whether the exception to the retroactive application of judicial decisions set forth in the federal cases cited by counties and retirement boards remains valid after *Harper v. Virginia Dept. of Taxation* (1993) 509 U.S. 86 [125 L.Ed.2d 74, 113 S.Ct. 2510]. The United States Supreme Court in *Harper* stated that it had previously held in *Davis v. Michigan Dept. of Treasury* (1989) 489 U.S. 803 [103 L.Ed.2d 891, 109 S.Ct. 1500] that "a State violates the constitutional doctrine of intergovernmental tax immunity when it taxes retirement benefits paid by the Federal Government but exempts from taxation all retirement benefits paid by the State or its political subdivisions." (*Harper, supra,* at p. 89.) The *Harper* court noted that the Supreme Court of Virginia twice refused to apply the *Davis* holding retroactively, relying on the retroactivity analysis in *Chevron, supra,* 404 U.S. 97. (*Harper, supra,* at pp. 89–90.) Although the Supreme Court did not specifically address the question of retroactivity in pension cases, it noted

"the fundamental rule of 'retrospective operation' that has governed '[j]udicial decisions ... for near a thousand years' " and, in the civil context, the exception to the rule set forth in *Chevron* when the court was announcing " 'a new principle of law' " and limiting its application would avoid " ' "injustice or hardship" ' without unduly undermining the 'purpose and effect' of the new rule." (*Harper, supra,* at pp. 94–95.) The *Harper* court pointed out that it had already held that judicial decisions would always apply retroactively in the criminal context (*Griffith v. Kentucky* (1987) 479 U.S. 314 [93 L.Ed.2d 649, 107 S.Ct. 708]), and that it was now making clear that such a rule applied in the civil context. (*Harper, supra,* at pp. 95–96.) "When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. This rule extends *Griffith*'s ban against 'selective application of new rules.' [Citations.] Mindful of the 'basic norms of constitutional adjudication' that animated our view of retroactivity in the criminal context [citation], we now prohibit the erection of selective temporal barriers to the application of federal law in noncriminal cases. In both civil and criminal cases, we can scarcely permit 'the substantive law [to] shift and spring' according to 'the particular equities of [individual parties'] claims' of actual reliance on an old rule and of harm from a retroactive application of the new rule. [Citation.] Our approach to retroactivity heeds the admonition that '[t]he Court has no more constitutional authority in civil cases than in criminal cases to disregard current law or to treat similarly situated litigants differently.' [Citation.]" (*Harper, supra,* at p. 97; see also *Reynoldsville Casket Co. v. Hyde* (1995) 514 U.S. 749, 752 [131 L.Ed.2d 820, 115 S.Ct. 1745] [court retroactively applied a prior decision that the state's tolling statute was unconstitutional, even though it resulted in dismissal of a lawsuit; court pointed out that *Harper* overruled *Chevron* "insofar as the case (selectively) permitted the prospective-only application of a new rule of law"]; *Ryder v. United States* (1995) 515 U.S. 177, 184–185 [132 L.Ed.2d 136, 115 S.Ct. 2031].)

■ We therefore conclude that, even presuming that the narrow exception for retroactivity created by the United States Supreme Court cases in the pension and Title VII context remains good authority, this exception has limited applicability to California law. Moreover, the equities in those federal situations differ significantly from those here. We therefore hold that the retroactive application of the *Ventura* decision is proper. Consequently, we need not address plan members' argument that applying the *Ventura* decision only prospectively would deny them equal protection of the law.

### III. ARREARS CONTRIBUTIONS

The trial court ruled that retirement boards had the discretion to collect arrears contributions. It stated that this discretion did "not mean that the retirement boards ... must collect arrears beyond the three-year limitations period." The court cautioned: "This decision is within the sound discretion of the retirement boards and presumably each board will exercise its discretion in a manner that is consistent with the best interests of its members. However, it is emphatically not the case, as [retirement boards'] argument at times seems to suggest, that a decision requiring the retirement boards to recalculate pension benefits correctly, in compliance with *Ventura,* compels the [retirement boards] to seek arrearage contributions beyond the three-year limitations period, or from retirees who receive no benefit from the retroactive application of *Ventura,* or at all. Arrears contributions may be authorized, but they are not mandatory, and the present record hardly demonstrates that they are necessary in any of the counties involved in this litigation." The court in a footnote explained that it retained "jurisdiction to resolve any disputes that may arise with respect to the right to collect arrearages or to offset arrearages against other amounts payable to plan members."

Retirement boards claim the trial court's ruling was correct, while counties contend that the court erred in refusing to rule that arrears contributions are mandatory. Plan members argue that the court erred in giving retirement boards discretion to recover arrears contributions or interest from members not benefiting from retroactive relief. They also maintain that the court should have ruled that any claims for excessive arrears contributions are barred by each retirement board's failure to pursue that relief within the three-year limitations period (Code Civ. Proc. § 338, subd. (d)). Both counties and plan members assert that the court did not properly apply the holdings in *Barrett, supra,* 189 Cal.App.3d 1593 and *Marin Firefighters, supra,* 30 Cal.App.4th 1638. We review these claims of legal error under the de novo standard of review. (See, e.g., *Burden v. Snowden, supra,* 2 Cal.4th at p. 562.)

In *Barrett,* the court ruled that CERL required certain work program supervisors to be reclassified from miscellaneous members to safety members, retroactive to their initial dates of employment as work program supervisors. (*Barrett, supra,* 189 Cal.App.3d at pp. 1597–1599, 1609.) This reclassification entitled affected employees to earlier·retirement eligibility and greater pension benefits. (*Id.* at p. 1597, fn. 1.) The plaintiffs maintained that equitable considerations barred the defendants from demanding arrears contributions, but the Court of Appeal disagreed. The court concluded that the defendant retirement board had the authority under CERL to collect both arrears contributions and interest for the period in question. The court noted that the "retirement system [is] based on contributions by both employer and

employee. (Gov. Code, §§ 31453, 31453.5, 31558–31567, 31581.)" (*Barrett, supra,* at p. 1609.) Thus, the burden of arrears contributions falls upon the plaintiffs and the defendant county. (*Ibid.*) The court explained that the plaintiffs will merely have to "pay their quid pro quo. They will receive the higher pension benefits retroactively but are required, as are all other safety members, to pay retirement contributions commensurate with the formula contributions paid by all other safety members during the entire course of their employment." (*Id.* at p. 1608, fn. omitted.)

In *Marin Firefighters,* the Court of Appeal held that the inclusion of holiday pay into final compensation had to be applied retroactively. (*Marin Firefighters, supra,* 30 Cal.App.4th at p. 1648.) The court stated that *Barrett* established that the retirement board "has the power to seek both arrears contributions and interest." (*Marin Firefighters,* at p. 1650, fn. omitted.) The *Marin Firefighters* court then considered whether the statute of limitations limited this power, an issue not addressed by *Barrett,* and concluded that it did not. (*Id.* at p. 1650.)

There is nothing in *Barrett* or *Marin Firefighters* to support counties' argument that the court erred in refusing to require retirement boards to collect arrears contributions. Indeed, in *Barrett,* the reviewing court concluded that the trial court erred when it ordered the defendant retirement board to pay all arrears contributions and applicable interest on behalf of the newly classified safety members. (*Barrett, supra,* 189 Cal.App.3d at pp. 1613–1614.) It stated that the court could not attempt to compel the retirement board "to exercise its discretion in a particular manner." (*Ibid.*) Thus, contrary to counties' assertions, the *Barrett* court did not mandate that retirement boards must collect arrears contributions, but clearly held that they had the discretion to do so.

Counties also argue that it would be unfair to them if retirement boards forego collecting arrears contributions and interest because, among other things, it would saddle counties with additional costs and treat pre-*Ventura* employees more favorably than active employees. These equitable arguments must fail. We cannot assess the equities of the situation because retirement boards have yet to take any action.

Plan members' equitable arguments must similarly fail. Plan members explain why the equities in this situation differ from those in *Barrett* and in *Marin Firefighters.* We do not disagree that there are significant differences between these cases and the ones before us, but—since retirement boards have not exercised their discretion as to how they are going to fund the shortfall resulting from their mistaken interpretation of CERL—it is premature for us to consider any equitable arguments.

In addition, plan members insist that CERL does not permit retirement boards to recoup arrears contributions and interest beyond that necessary to finance that portion of retroactive benefits intended to be funded by the member, but they cite no authority for this proposition. Further, they claim that retirement boards do not have the authority to collect excessive arrears contributions, since they are barred by each retirement board's failure to pursue that relief within the three-year limitations period (Code Civ. Proc., § 338, subd. (d) ). Plan members contend that the "most accurate and equitable way to finance the member-funded portion of the enhanced benefits resulting from granting retroactive relief would be to reduce the retroactive recovery (both for arrears pension adjustments and future pension adjustments) accordingly."

Without addressing the details of plan members' argument, we reject it. They are urging us to order retirement boards to act in a specific manner, and to usurp the boards' authority. "When a statute imposes upon an administrative body discretion to act under certain circumstances, mandate will not lie to compel the exercise of such discretion in a particular manner. [Citation.]" (*Barrett, supra,* 189 Cal.App.3d at p. 1613.) Moreover, it is unclear that any of the issues raised by plan members will need to be addressed. Retirement boards may decide to use excess earnings of the pension system, as OCERS did, or to implement other corrective measures such as designating the shortfall as unfunded liability that the county can amortize over 30 years under sections 31453, 31453.5, 31453.6, and 31454. Thus, until each retirement board exercises its discretion to correct for its miscalculations under CERL, we cannot determine whether it has abused its discretion.

LACERA members contend that LACERA Board did not collect arrears contributions for its post-*Ventura* retirees and it therefore exercised its discretion not to collect any arrears contributions. They claim that retirement boards cannot treat pre-*Ventura* retirees disparately as that would constitute an arbitrary, and therefore unlawful, determination. This argument, too, must fail. Without knowing if LACERA Board is going to collect arrears contributions from pre-*Ventura* retirees and, if it does, its reasons for doing so, we cannot assess its actions. Simply because LACERA Board funded the increased benefits to the post-*Ventura* retirees without collecting arrears contributions does not establish that it has the funds to avoid collecting arrears contributions for the pre-*Ventura* retirees. Since LACERA Board has not yet acted, we cannot determine whether it has acted arbitrarily.

We note that, although retirement boards have discretion to manage their retirement systems, this discretion is not unfettered. Article XVI, section 17, of the California Constitution states in relevant part: "[T]he retirement board of a public pension or retirement system shall have plenary authority and

fiduciary responsibility for investment of moneys and administration of the system, subject to all of the following: [¶] (a) The retirement board of a public pension or retirement system shall have the sole and exclusive fiduciary responsibility over the assets of the public pension or retirement system. The retirement board shall also have sole and exclusive responsibility to administer the system in a manner that will assure prompt delivery of benefits and related services to the participants and their beneficiaries. The assets of a public pension or retirement system are trust funds and shall be held for the exclusive purposes of providing benefits to participants in the pension or retirement system and their beneficiaries and defraying reasonable expenses of administering the system. [¶] (b) The members of the retirement board of a public pension or retirement system shall discharge their duties with respect to the system solely in the interest of, and for the exclusive purposes of providing benefits to, participants and their beneficiaries, minimizing employer contributions thereto, and defraying reasonable expenses of administering the system. A retirement board's duty to its participants and their beneficiaries shall take precedence over any other duty."

The trial court retained jurisdiction to address any issues that may arise regarding the collection of contributions of arrearages. Rather than trying to anticipate problems that may not even occur, we believe the trial court's approach was sound and correct. Accordingly, we affirm its ruling on the collection of contributions of arrearages.

## IV. ITEMS OF REMUNERATION TO BE INCLUDED IN CALCULATIONS OF "FINAL COMPENSATION"

Plan members contend that the trial court erred when it ruled that cash-outs by employees of unused leave upon separation from service (termination pay), insurance-related payments made by the employer, and payments of mandatory employee retirement contributions (pick-ups) that are paid by the employer directly to the retirement plan are not included in the calculations of "final compensation" for retirement benefits. ▉ Since this is a question of statutory construction, we review the court's ruling under the de novo standard of review.[20] (See, e.g., *Burden v. Snowden, supra,* 2 Cal.4th at p. 562, 7 Cal.Rptr.2d 531, 828 P.2d 672.)

"[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to

---

[20] Because we are considering what must be included under the statute and we conclude that the items requested by plan members do not have to be included under CERL, we need not consider L.A. County's argument that these items cannot be included because they would frustrate the understandings and expectations of L.A. County (see § 3500 et seq.).

the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. … The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med., Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386–1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) " 'Rules of statutory construction require courts to construe a statute to promote its purpose, render it reasonable, and avoid absurd consequences.' [Citation.]" (*Ford v. Gouin* (1992) 3 Cal.4th 339, 348 [11 Cal.Rptr.2d 30, 834 P.2d 724].)

With regard to pension legislation, pension provisions shall be liberally construed and we resolve all ambiguities in favor of the pensioner. (*Barrett, supra,* 189 Cal.App.3d at p. 1603.) "However, this rule of liberal construction is applied for the purpose of effectuating obvious legislative intent and should not blindly be followed so as to eradicate the clear language and purpose of the statute and allow eligibility for those for whom it was obviously not intended." (*Ibid.*)

To be included in the calculation of pension benefits, the court must first determine what items of remuneration fall into the broad definition of "compensation" under section 31460, and then determine whether they fall within the narrower category of "compensation earnable" as defined in section 31461 "and thus form the basis for the calculation of 'final compensation' on which the pension is based pursuant to section 31462 or 31462.1." (*Ventura, supra,* 16 Cal.4th at pp. 493–494.) As noted earlier, section 31461 defines "[c]ompensation earnable" as "the average compensation as determined by the board, for the period under consideration upon the basis of the average number of days ordinarily worked by persons in the same grade or class of positions during the period, and at the same rate of pay."

## A. *Termination Pay*

Plan members contend that termination pay should be included in the final calculation of their benefits. By termination pay, they are referring to the one-time cash payments made to plan members upon retirement for accrued but unused compensatory time, sick leave time, and vacation or holiday time. Plan members contend that there is no significant difference between annual in-service cash payments, which *Ventura* held to be included in pension computations, and termination payments.

The *Ventura* court considered the question of annual leave and concluded: "When annual leave is taken as time off, the employee simply continues to receive regular salary or wages without the necessity of performing services.

Receipt of that pay is part of the employee's 'remuneration' for past services and is 'compensation.' When an employee elects to receive cash in lieu of accrued vacation and the wages or salary the employee would receive during the vacation period, the cash, like the vacation pay the employee would otherwise receive, is part of the employee's 'remuneration' for past services. The same analysis applies to the county's 'longevity incentive' since that item simply grants additional vacation hours to be accrued or cashed out to those employees with five years or more service who are covered by the resolution. Payment to longtime employees, whether in salary for vacation days on which no work is performed or in additional cash, is equivalent to increased pay that often accompanies seniority. It, too, is 'remuneration' and 'compensation.' " (*Ventura, supra,* 16 Cal.4th at pp. 497–498, fn. omitted.)

Interpreting *Ventura,* the trial court ruled that termination pay is not "compensation" or "compensation earnable" when the employee cannot or does not elect to receive cash in lieu of the accrued time off prior to retirement. Further, "[s]ection 31462.1 defines 'final compensation' as 'the average annual compensation earnable by a member during any year elected by a member at or before the time he files an application for retirement, or, if he fails to elect, during the year *immediately preceding* his retirement.' (Italics added; see also § 31462.)" The court explained: "The phrase 'any year elected by a member' can refer only to a year of employment, as the default provision upon a failure to elect makes explicit. The plain language of Section 31462.1 thus makes clear that the final compensation period extends up to, but does not include retirement. The one time cash-out of accrued leave becomes payable 'upon separation' from services. (§ 19839.) Separation and retirement occur when employment has terminated, and not during the period of employment itself. For this reason, termination pay need not be included in final compensation."

Plan members contend that prior to their retirement they earn the ability to take the time off without loss of pay and the right to cash out unused paid leave benefits at retirement. These benefits are vested fundamental rights earned by plan members for services rendered, and protected from forfeiture. (See Lab. Code, § 227.3.) Employees, according to plan members, cannot be forced to use their leave benefits prior to retirement. They contend that since the "benefits not used before retirement are automatically cashed out at separation, it logically follows that the decision to 'cash out' was made before retirement by virtue of the election not to use the benefits during that time frame."

This argument is, however, unpersuasive. ■ Whether sick leave or vacation time is included in the calculations for benefits does not bear on plan members' vested rights to this time, nor does it in anyway compel them to

cash-out prior to retirement. Rather, if they do not or cannot cash out their time prior to retiring, they have received an "in-kind" benefit, not to be calculated as part of their "final compensation."

Plan members contend that it does not make sense to have a gap between the measurement of "final compensation" and retirement. However, the language of the statute is that "final compensation" is "the average annual compensation earnable by a member during any year elected by a member at or before the time he files an application for retirement, or, if he fails to elect, during the year *immediately preceding* his retirement." (§ 31462.1, italics added.) This language is not ambiguous; it plainly excludes retirement and we will not rewrite the statute.

Plan members also cite the following language of section 31461: "Compensation, as defined in Section 31460, that has been deferred shall be deemed 'compensation earnable' when earned, rather than when paid." According to this language, plan members assert, termination payments became "compensation earnable" when the right to this compensation was earned, not when it was paid. Thus, their right to termination payments vested prior to their retirement from service. We, however, agree with the following comments of the trial court: "On its face, the sentence appears to apply to payments made to a deferred compensation plan. Moreover, as termination pay is not required to be included in compensation as defined in section 31460, the sentence in section 31461 has no further application to the issue." As already made clear by the *Ventura* court, only cash payments are compensation. (*Ventura, supra,* 16 Cal.App.4th at p. 497.) The reason for expressing by statute that amounts deducted from an employee's wages for participating in a deferred compensation plan are "compensation" when earned was "[to] make it clear that the deferred funds, which clearly would have been 'compensation' if paid in the normal course, do not lose that status for pension purposes even though they had not been received by the employee at the time the pension was calculated." (*Id.* at p. 495.) However, as the trial court explained: "Where an employee cannot or does not elect to receive cash in lieu of the accrued time off prior to retirement, the benefit remains one of time rather than cash." The right to a termination pay cash-out arises only upon retirement (§ 19839),[21] that is *separated* from service; the right does not arise prior to retirement or during service.

---

[21] Section 19839 provides in relevant part: "(a) Upon separation from service without fault on his or her part, a person is entitled to a lump-sum payment as of the time of separation for any unused or accumulated vacation or annual leave or for any time off to which he or she is entitled by reason of previous overtime work where compensating time off for overtime work is provided for by the appointing power or by rules of the department.... [¶] (b) Persons separated from service through fault of their own are entitled to a lump-sum payment for compensating time off for overtime work, and in addition, the portion, if any, of unused vacation or annual leave as the department may determine...."

Not including termination pay in the calculation of pension benefits finds further support under PERL. As recognized in *Ventura,* the language used to define "compensation" and "compensation earnable" under CERL and PERL was originally essentially the same, and only later was CERL's definition amended to exclude in-kind advantages while PERL was not so amended. (*Ventura, supra,* 16 Cal.4th at p. 497.) " '[W]hen words used in a statute have acquired a settled meaning through judicial interpretation, the words should be given the same meaning when used in another statute dealing with an analogous subject matter; this is particularly true, where ... both statutes were enacted for the welfare of employees and are in harmony with each other.' [Citation.]" (*Id.* at p. 496, fn. 16, quoting *Kuntz v. Kern County Employees' Retirement Assn.* (1976) 64 Cal.App.3d 414, 422 [134 Cal.Rptr. 501].)

When PERL's "compensation" and "compensation earnable" statutes were essentially the same as those in CERL, termination pay was excluded from calculating retirement benefits. [22] (*Santa Monica Police Officers Assn. v. Board of Administration* (1977) 69 Cal.App.3d 96, 100 [137 Cal.Rptr. 771].) The court in *Santa Monica Police* reasoned that lump sums for termination pay were like overtime pay in that they both were accrued when the employee works more than expected, and the Legislature expressly excluded overtime pay from the compensation to be included in computing a pension. (*Ibid.*) Thus, "viewing the State Retirement System as an entity," the court concluded that "the Legislature intended to exclude lump-sum payments for unused sick leave and vacation time from pension computations." (*Id.* at p. 101, fn. omitted; see also *Hudson v. Board of Administration* (1997) 59 Cal.App.4th 1310, 1323 [69 Cal.Rptr.2d 737] [including termination pay would permit "spiking" of pension benefits].)

Termination payments have never been included in the definition of "compensation earnable" under PERL, and plan members have presented no compelling reason as to why this construction under PERL should not apply to "compensation earnable" under CERL. ▮ Accordingly, we hold that termination pay that is received upon retirement is not required under CERL to be included in the calculation of pension benefits.[23]

---

[22] The PERL provision defining "compensation earnable" excludes "final settlement pay," which is defined to mean "any pay or cash conversions of employee benefits that are in excess of compensation earnable, that are granted or awarded to a member in connection with or in anticipation of a separation from employment." (§ 20636, subds. (f), (g)(4)(G).) It also excludes "[p]ayments for unused vacation, annual leave, personal leave, sick leave, or compensating time off, whether paid in lump sum or otherwise." (§ 20636, subd. (g)(4)(F).)

[23] We need not address counties' argument that section 31641.03 establishes that the Legislature has evinced its intent not to treat accrued leave cashed out upon termination as "compensation." Section 31641.03 provides in relevant part: "In any county the board of supervisors may provide by ordinance that members specified in the ordinance shall be credited, for up to 100 percent of sick leave accumulated as of the date of their retirement, and

### B. *Employer's Payment of Insurance-related Premiums*

Plan members assert that an employer's (1) cash payments into members' flexible benefit plans that were used to pay insurance premiums for the member (and/or cash payments to purchase benefits for the members) and (2) cash payments to insurers to satisfy the member's obligation to pay premiums for insurance provided to the member should be included in the calculations of their pension benefits. They claim that neither the statute nor *Ventura* imposes a requirement that the cash payment must be made directly to the employee in order to qualify as "compensation" under CERL. They maintain that insurance premiums paid by employers are paid in cash to third parties and are, therefore, remuneration paid in cash, not in-kind advantages.[24]

Section 31460 defines "compensation" as "the remuneration paid in cash out of county or district funds, plus any amount deducted from a member's wages for participation in a deferred compensation plan…, but does not include the monetary value of board, lodging, fuel, laundry, or other advantages furnished to a member." Plan members contend that this statute does not specify that the cash payment has to be made to the employee, but merely requires that the remuneration paid by the county be in cash.

 The *Ventura* court has already noted that section 31461 is ambiguous in some respects, but the court made it clear that "compensation" under section 31460 must be cash payments, not in-kind advantages. (*Ventura, supra,* 16 Cal.4th at p. 493.) It held that section 31460 includes any remuneration paid in cash and any amount deducted from the employee's wages for a deferred compensation plan. (*Ventura, supra,* at p. 494.) Contributions not deducted from an employee's wages do not constitute "compensation." (*Id.* at pp. 494–495.)

The language of the *Ventura* opinion indicates that it was focusing on *what the employee was receiving* to determine whether the remuneration was being paid in cash or was an in-kind advantage. The *Ventura* court explained that, prior to 1951, section 31460 allowed in-kind advantages to be "compensation" if they "were provided to an employee in payment or partial payment for the employee's services." (*Ventura, supra,* 16 Cal.4th at p. 495.) In 1951, the statute was amended to provide "that the monetary value of those items and other advantages was not to be included in 'compensation' for this

---

that sick leave credit shall be in addition to service credit. The additional cost to the retirement system shall be borne by the county or district."

[24] Plan members also claim that these payments are really "cash payments to a creditor of the member to satisfy debts the member otherwise would have to pay himself." These attempts to characterize these payments as cash payments to the employee only underscore the need for a bright-line rule that requires the employee to *receive* a cash payment from the employer.

purpose." (*Ibid.*) The court explained: "CERL differs from the PERL legislation under consideration in that it excludes, rather than includes, the monetary value of an advantage provided in kind. It does not follow, however, that when the advantage *is one received by the employee in cash,* the section 31460 exclusion for the 'monetary value' of the advantage is applicable. Under the distinction the statute makes for in-kind advantages, even though a noncash 'advantage' may be 'remuneration' for the employee's services, the Legislature has relieved CERL counties of the obligation to assign a cash value to in-kind advantages provided to employees and of including that amount in 'compensation' for pension purposes. The Legislature has recognized that some *employees receive remuneration other than wages or salary* but has concluded that if those 'advantages' are not paid in cash, their value need not be included in 'compensation' for purposes of computing a pension. It has not done so for cash payments made in lieu of providing the same advantages in kind." (*Id.* at p. 497, italics added.)

 Thus, although the exact question before us was not directly addressed by *Ventura,* the language of the opinion indicates that it considered the statute to limit the definition of "compensation" to cash remuneration *provided* to the employee for his or her services. Here, the employee is receiving an insurance premium, not a cash payment. Thus, it is an in-kind benefit, which is not "compensation" under section 31460. [25]

Plan members contend that counties pay cash to a third party and therefore, unlike the in-kind advantages excluded as "compensation" in *Ventura,* a precise monetary value can be ascertained. However, we do not agree that whether a precise monetary value can be determined is critical to the definition of "compensation" under CERL. Rather, the *Ventura* court was simply noting that the Legislature had "relieved CERL counties of the obligation to assign a cash value to in-kind advantages provided to employees ...." (*Ventura, supra,* 16 Cal.4th at p. 497.) It did not suggest that in-kind advantages qualified as "compensation" if a cash value could easily be assigned. (*Ibid.*) Moreover, we agree with the trial court that all in-kind benefits require, at some point, "a cash payment or transfer of funds to either a third party or a separate county department. A rule that differentiated between in-kind benefits based on the ease of determining their monetary value would be unworkable and contrary to the bright line drawn by *Ventura,*

---

[25] Plan members contend that this payment is no different than a payroll authorization directing the employer to divert a portion of a member's salary to make cash payments directly to a charitable institution, to the union for dues, or to the retirement system. However, when the employer makes the payment to the insurance company, the employee never receives any payment or income to be directly transferred. Indeed, if the employee did receive the money, the employee would have to pay tax. Thus, these tax savings devices, as plan members label them, permit the employee to avoid paying taxes, but they are also excluded from the definition of "compensation" under CERL.

which must be understood to be between those benefits paid in cash to the employee and those that are not." Indeed, a definite sum could be expended for board or lodging, but section 31460 expressly disallows such sums to be considered as "compensation" if the money is not paid directly to the employee. We see no reason why the payment of insurance premiums should be any different. The employee receives insurance coverage, not cash, and therefore it is not "compensation" under CERL.

Further, in making its ruling, the trial court properly relied on CERL statutes and legislative history relating to the treatment of flexible benefits to conclude that payments to third parties for insurance benefits are not required to be included in pension calculations. On June 15, 1990, the Legislature enacted section 31460.1, which read: " 'Compensation' shall not include employer payments, including cash payments, made to, or on behalf of, their employees who have elected to participate in a flexible benefits program, where those payments reflect amounts that exceeds [so in chaptered copy] their employees' salaries." (Stats. 1990, ch. 142, § 1, p. 1191.) The Legislature, however, on May 11, 1992, repealed this statute by Senate Bill No. 193 (1991–1992 Reg. Sess.). (Stats. 1992, ch. 45, § 1, p. 158.)

Senate Bill No. 193 (1991–1992 Reg. Sess.) provided in part: "Sec. 3. The Legislature hereby finds and declares that: [¶] … [¶] (3) Section 31460.1 has been erroneously construed as implicitly requiring counties maintaining retirement systems under the 1937 act to include in 'compensation' those flexible benefits payments until the board of supervisors elect pursuant to that section to exclude those flexible benefits payments from 'compensation.' [¶] (4) That interpretation was not intended by the Legislature when it enacted that section. Had that been the intent of the Legislature when it enacted Assembly Bill [No.] 3146, it would have been a substantial departure from the long-standing practice of the Legislature of not intruding into the county decisionmaking process regarding compensation determinations with respect to those county retirement systems (see Sections 31460 and following, Government Code). [¶] … [¶] (8) Any reversal or termination, on or after the effective date of this act, of county actions taken on the basis of misconstruction of the intent and meaning of Section 31460.1 of the Government Code would merely restrict county employees to those gains reasonably to be expected from their county retirement contracts and withhold unforeseen and windfall advantages which bear no relation to the fundamental theory and objective of the county retirement systems maintained pursuant to the County Employees Retirement Law of 1937 and would, therefore, not constitute an unconstitutional impairment of the county retirement contract [citation]." (Stats. 1992, ch. 45, § 3, pp. 158–159.)

Plan members contend that Senate Bill No. 193 (1991-1992 Reg. Sess.) did not change the language of the definitions in section 31460and 31461; it simply repealed section 31460.1. However, contrary to plan members' assertions, the Legislature expressed its intent that it *never* considered inclusion of flexible benefits to be mandatory under CERL.

Plan members also argue that subsequent legislative interpretations have very little or no effect upon the construction of laws promulgated by a different Legislature. (See, e.g., *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1137 [203 Cal.Rptr. 886] (*Honey Springs*); *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357] ["The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law. [Citations.] This is especially true when, as here, such declared intent is without objective support in either the language or history of the legislation and (until recently) is contrary as well to the practice of the affected agency" (fn. omitted)]; see also *People v. Martinez* (1987) 188 Cal.App.3d 1254, 1259 [233 Cal.Rptr. 877].) However, " '[a]lthough a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed.' [Citations.]" (*Honey Springs, supra,* at p. 1137.)

We agree that " '[t]he Legislature has no authority to interpret a statute. That is a judicial task. [However], [t]he Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean. Courts do take cognizance of such declarations where they are consistent with the original intent. "[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act. [Citations.]" [Citation.]' " (*Honey Springs, supra,* 157 Cal.App.3d at p. 1137.)

" 'Our task is to discern the intent of the statute from its applicable language and context.' " (*Honey Springs, supra,* 157 Cal.App.3d at p. 1137.) Although the Legislature's comment regarding why it repealed section 31460.1 is not binding upon us, it still aids in our understanding of the legislative intent. Thus, " '[w]e assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law.

[Citation.] Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning.' [Citation.] 'One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation: " 'An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute ....' " ' [Citation.]" (*Hudson v. Board of Administration, supra,* 59 Cal.App.4th at p. 1322.) Because Senate Bill No. 193 (1991–1992 Reg. Sess.), which clarified the Legislature's intention regarding former section 31460.1 (an amendment to CERL), was set forth just two years after enacting this statute, it "must be accepted as the legislative declaration" (*Hudson, supra,* at p. 1322) of the meaning of section 31460.1 and its interpretation of the requirements under CERL.[26]

■ We conclude that the Legislature has expressed its intent not to include employer payments into flexible benefit plans and payments of insurance carrier premiums as "compensation" under CERL, which is consistent with the language of CERL, in harmony with the statutory framework of CERL as a whole, and consistent with the interpretation of CERL as set forth in *Ventura*.[27] Accordingly, we conclude the trial court properly found that CERL did not require these payments to be included in the calculation of retirement benefits.

## C. *Employer Pick-ups of Employee's Retirement Contributions*

Under sections 31581.1, 31630, or 31639.85, county employers may make employee contributions to the retirement system, and plan members contend the trial court erred in refusing to include these contributions in the

---

[26] Plan members argue that the later adoption of sections 31461.1and 31461.4 in 1993 and 1999, respectively, which gave L.A. County the option to exclude flexible benefits for newly hired employees and to exclude any increase in flexible benefit contributions, establishes that flexible benefits were required to be included in "compensation" and "compensation earnable." Otherwise, they argue, there was no reason to provide L.A. County with special authorization to remove these payments from the definition. However, in 1992, LACERA had included certain flexible benefit contributions in compensation earnable to the extent that the employee could elect to receive such contributions in cash. These later statutes were therefore necessary to permit L.A. County to limit the inclusion of flexible benefits. (See *Howard Jarvis Taxpayers' Assn. v. Board of Supervisors* (1996) 41 Cal.App.4th 1363, 1373–1374 [49 Cal.Rptr.2d 157].)

[27] We note that PERL expressly excludes payments to third parties to procure insurance coverage (§ 20636, subd. (g)(4)(A) & (K)). Unlike CERL, PERL also expressly excludes cash payments made to an employee in lieu of health services (*ibid.*).

calculation of "compensation earnable" for pension benefits. The specific pick-ups at issue are those where the employer pays portions of the member contribution directly to the retirement fund, and nothing is deducted from the member's salary. It is undisputed that contributions deducted from a member's salary are included in the calculation of retirement benefits under CERL.

■ Section 31460 defines "compensation" as "the remuneration paid in cash ...plus any amount deducted from a member's wages for participation in a deferred compensation plan ...." The *Ventura* court held that under section 31460 any sum deducted from a member's wages for participation in a deferred compensation plan was "compensation" under the statute, but that "cannot be said of a county contribution to an employee's deferred compensation plan." (*Ventura, supra,* 16 Cal.4th at p. 494.) We agree with the trial court that this reasoning applies to retirement benefit pick-ups. When pick-ups are not deducted from the employee's salary, they are not "compensation" under section 31460.

We also agree with the trial court that plan members' attempt to characterize these pick-ups as essentially salary substitutes and therefore compensation must fail. Employer contributions to deferred compensation plans are not considered salary substitutes, and there is no more compelling reason to consider employer pick-ups as salary substitutes. As the trial court explained, "there is no language in the statute or reason in principle why the pick-up of retirement plan contributions should be treated differently." In addition, pick-ups not deducted from a member's salary are excluded under PERL. (§ 20636, subd. (g)(4)(E); see also *Oden v. Board of Administration* (1994) 23 Cal.App.4th 194, 209 [28 Cal.Rptr.2d 388] ["Employer-paid member contributions were authorized to reduce employees' income tax liability; they were not meant to increase retirement awards"].)

Furthermore, since the pick-ups do not involve any deduction in the employee's salary and the *employee does not receive any cash payment*, an employer paid pick-up is not "compensation" under CERL. (See pt. IV.B, and our discussion of the employer's payment of insurance-related benefits.)

## DISPOSITION

The judgments are affirmed. No party is awarded costs.

Haerle, Acting P. J., and Ruvolo, J., concurred.

A petition for a rehearing was denied August 11, 2003, and the petitions of all appellants for review by the Supreme Court were denied October 15, 2003. Kennard, J., and Baxter, J., did not participate therein.